**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

SANTA FE ALLIANCE FOR PUBLIC HEALTH
AND SAFETY, ARTHUR FIRSTENBERG, and
MONIKA STEINHOFF,

        Plaintiffs,

vs.                                  No. 18-1209

CITY OF SANTA FE, NEW MEXICO;
HECTOR BALDERAS, Attorney General of New
Mexico; and the UNITED STATES OF AMERICA,

        Defendants.

**COMPLAINT FOR DECLARATORY JUDGMENT**
**AND INJUNCTIVE RELIEF**

COME NOW the SANTA FE ALLIANCE FOR PUBLIC HEALTH AND SAFETY

("ALLIANCE") and MONIKA STEINHOFF by and through their attorney, and ARTHUR

FIRSTENBERG, pro se, and in their Complaint against the CITY OF SANTA FE ("CITY"),

NEW MEXICO ATTORNEY GENERAL HECTOR BALDERAS, and the UNITED STATES OF

AMERICA ("UNITED STATES"), state as follows:

## INTRODUCTION

1.      For at least fifty years, the United States of America has known that

radio frequency ("RF") radiation, even at extremely low levels of exposure, is

injurious to human health and the environment, and that the continuous expansion

of wireless telecommunications would endanger its population, including Plaintiffs,

and the ecosystems and natural resources upon which they depend for their

wellbeing and survival.  Despite this knowledge, the United States enacted a law *prohibiting* States and municipalities from regulating wireless telecommunications on the basis of their environmental effects, which has been assumed to include health effects.  This law is Section 704 of the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(iv) and (v) ("Section 704").

2.      For at least twenty years, the City of Santa Fe has known that RF radiation, even at extremely low levels of exposure, is injurious to health and environment, and that the continuous expansion of wireless telecommunications would endanger Plaintiffs and the ecosystems and natural resources upon which they depend for their wellbeing and survival.  Despite this knowledge, the City has dismantled all of the protections it previously put in place to protect its residents from harm.  It has repealed all land use regulations that previously ensured that RF radiation-emitting antennas could not be placed on sidewalks in front of homes and businesses, and it has repealed all notice requirements and all means of public participation in decisions that endanger their health and their environment.  The ordinances by which these protections were repealed are Ordinances No. 2016-42 and 2017-18.  Further, on November 21, 2017, the Mayor of Santa Fe issued the first of three unlawful executive Proclamations, which suspended the Land Development Code, including public notice requirements, with respect to telecommunications facilities on City-owned property.  Seven short cell towers have been built on City land with no public process at all under the Proclamations.

3. For at least a decade, the State of New Mexico has known that RF radiation, even at extremely low levels of exposure, is injurious to health and environment, and that the continuous expansion of wireless telecommunications would endanger Plaintiffs and the ecosystems and natural resources upon which they depend for their wellbeing and survival. Despite this knowledge, the State of New Mexico passed a law providing that RF radiation-emitting antennas in the public rights-of-way are a permitted use, not subject to land use review, throughout New Mexico. This law, which went into effect on September 1, 2018, is the Wireless Consumer Advanced Infrastructure Investment Act ("WCAIIA"). Sections 4(C) and 5(B) of WCAIIA exempt both new antennas and new supporting structures for antennas from land use review. NMSA 1978 §§ 63-9I-4(C) and 63-9I-5(B).

4. Telecommunications companies, enabled by laws prohibiting the public from participating in decisions affecting their health, environment, and survival, are poised right now to roll out the fifth-generation wireless network (5G). This is acknowledged and advertised to bring unprecedented societal change on a global scale. We will have "smart" homes, "smart" businesses, "smart" highways, "smart" cities and self-driving cars. Virtually everything we own and buy, from refrigerators and washing machines to milk cartons, hairbrushes and infants' diapers, will contain antennas and microchips and will be connected wirelessly to the Internet. Every person on Earth will have instant access to super-high-speed, low-latency wireless communications from any point on the planet, even in rainforests, mid-ocean and the Antarctic.

5.      What is known to governments and to scientists working in the field of bioelectromagnetics, but is not widely known to the general public, is that this will also result in unprecedented *environmental* change on a global scale.  The planned density of radio frequency ("RF") transmitters is extraordinary.  In addition to millions of new 5G base stations on Earth and 20,000 new satellites in space, 200 billion transmitting objects, according to estimates, will be part of the Internet of Things by 2020, and one *trillion* objects a few years later.

6.      In order to transmit the enormous amounts of data required for the Internet of Things, 5G technology, when fully deployed, will use millimeter waves, which are poorly transmitted through solid material.  This will require every carrier to install base stations (also referred to herein as "cell towers") every 100 meters in every urban area in the world.  The existence of multiple competing carriers means there will be a base station in front of every third to fifth house.  Unlike previous generations of wireless technology, in which a single antenna broadcasts over a wide area, 5G base stations and 5G devices will have multiple antennas arranged in "phased arrays," that work together to emit focused, steerable, laser-like beams that track each other.

7.      Each 5G phone will contain dozens of tiny antennas, all working together to track and aim a narrowly focused beam at the nearest base station.  The Federal Communications Commission ("FCC") has adopted rules permitting the effective power of those beams to be as much as 20 watts, ten times more powerful than the levels permitted for current phones.

8.     Each 5G base station will contain hundreds or thousands of antennas aiming multiple laser-like beams simultaneously at all cell phones and user devices in its service area.  This technology is called "multiple input multiple output" or MIMO.  FCC rules permit the effective radiated power of a 5G base station's beams to be as much as 30,000 watts per 100 MHz of spectrum, or equivalently 300,000 watts per GHz of spectrum, tens to hundreds of times more powerful than the levels permitted for current base stations.

9.     The FCC regulates the technical aspects of telecommunications only, has no statutory authority over health, and has repeatedly disclaimed any expertise or authority over health or environment.  Its RF exposure guidelines are neither mandatory nor enforceable.  They are procedural only and serve only to determine whether an FCC licensee must file an Environmental Assessment or not.  Health and safety are State functions, and as a zoning authority the City is obligated to safeguard the health of its citizens and may not abdicate this responsibility.

10.     Even before 5G was proposed, scientists working in this field globally have presented dozens of declarations, petitions and appeals to their governments calling for a halt to the expansion of wireless technology and a moratorium on new base stations.  Already in 2002, the Freiburger Appeal, signed by over 3,000 physicians, warned that radiation from cell phones and cell towers was causing serious health impacts including "heart attacks and strokes among an increasingly younger population."

11.     In 2015, 215 scientists from 41 countries, all of them researchers engaged in the study of biological and health effects of electromagnetic fields, communicated their alarm to the United Nations and World Health Organization ("WHO").  They stated that "numerous recent scientific publications have shown that EMF [electromagnetic fields] affects living organisms at levels well below most international and national guidelines."

12.     More than 10,000 peer-reviewed scientific studies demonstrate harm to human health from low-level RF radiation.  Effects include:

- Alteration of heart rhythm
- Altered gene expression
- Altered metabolism
- Altered stem cell development
- Cancers
- Cardiovascular disease
- Cataracts
- Cognitive impairment
- Diabetes
- DNA damage
- Impacts on general well-being
- Increased free radicals
- Learning and memory deficits
- Impaired sperm function and male infertility

- Miscarriage

- Neurological damage

- Obesity and diabetes

- Oxidative stress

13.　Effects in children include autism, attention deficit hyperactivity disorder ("ADHD") and asthma.

14.　Damage goes well beyond the human race, as there is abundant evidence of harm to diverse plant- and wildlife and laboratory animals, including:

- **Ants.** *Exposure to cell phones, cordless phones, or WiFi in the laboratory causes behavioral disturbances and mortality.*

- **Birds.** *Proximity to cell towers impairs reproduction and diminishes populations.*

- **Forests.** *RF radiation causes forest dieback, mimicking the effects of acid rain.*

- **Amphibians.** *Proximity to a cell tower in an urban laboratory caused 95 percent mortality; RF radiation has contributed to the extinction of scores of species worldwide.*

- **Fruit flies.** *Exposure to a cell phone in the laboratory impairs reproduction and causes mortality and genetic abnormalities.*

- **Honey bees.** *A ten-minute exposure to a cell phone in the laboratory causes digestion of food to come to a complete halt at the*

cellular level; RF radiation causes swarming and is a primary cause of colony collapse disorder.

- **Insects.** *Insect populations in nature preserves and rainforests plummeted when cell towers were erected nearby.*

- **Farm Animals.** *Proximity to cell towers causes heart and circulatory failure and internal bleeding in cows, and abortions and reproductive failure in cows and pigs.*

- **Mice.** *Proximity to a cell tower in an urban laboratory impaired reproduction and caused irreversible sterility within five generations.*

- **Plants.** *RF radiation shortens life-span, impairs growth, and causes developmental abnormalities in duckweed plants.*

- **Rats.** *A two-hour exposure to a cell phone causes permanent brain damage.*

- **Trees.** *Aspen trees throughout Colorado no longer grow normally; only when shielded from RF radiation do they display the fall colors they were once famous for.*

15. These studies have been performed by the following:

- United States Army

- United States Navy

- United States Air Force

- United States Environmental Protection Agency ("EPA")

- Governments of other nations

- Thousands of scientists and researchers worldwide

16.     The results of this medical and scientific research are publicly available and may be found in

- Senate Reports

- House of Representative Reports

- EPA Reports

- Peer-reviewed scientific journals published worldwide

17.     The EPA has stated repeatedly that the human exposure guidelines that were adopted by the FCC on August 6, 1996 are protective only against shocks, burns, and gross heating and do not protect against chronic and low-level exposure. An EPA letter dated October 8, 1996 stated that the guidelines "are thermally based, and do not apply to chronic, nonthermal exposure situations." Again on March 8, 2002, the EPA stated that "The FCC's current exposure guidelines, as well as those of the Institute of Electrical and Electronics Engineers (IEEE) and the International Commission on Non-Ionizing Radiation Protection, are thermally based, and do not apply to chronic, nonthermal exposure situations."

18.     A June 17, 1999 letter, signed by the entire Radiofrequency Interagency Work Group ("RFIAWG"), whose members represented the FCC, EPA, Food and Drug Administration, National Institute of Occupational Safety and Health, Occupational Safety and Health Administration, and National Technical Information Agency, stated that the FCC's guidelines are based on "thermal effects" and "acute exposures" and do not consider "chronic exposure to RF radiation,

including exposures having a range of carrier frequencies, modulation characteristics, peak intensities, exposure duration, etc., that does not elevate tissue temperature on a macroscopic scale."

19.     Peer-reviewed studies have recently been published, predicting thermal skin burns  in humans from 5G radiation and resonant absorption by insects, which absorb up to 100 times as much radiation at millimeter wavelengths as they do at wavelengths presently in use.  Since insect populations have declined by 75 to 98 percent since the 1970s, even in protected nature areas, 5G radiation could have catastrophic effects on insect populations as well as birds and other species that depend on them.  A 1986 study by Om Gandhi at the University of Utah warned that millimeter waves are strongly absorbed by the cornea of the eye, and that ordinary clothing, being of millimeter-size thickness, increases the absorption of energy by the skin by a resonance-type effect.

20.     Together, the new City ordinances, the new State Act, and Section 704 remove all public protection from injurious facilities in the public rights-of-way, infringe on the public's right to speak about a danger to their own health, eliminate all public participation into the siting of such facilities, and deprive injured parties of any remedy for their injuries.  Plaintiffs are such injured parties.  Plaintiffs and Plaintiff's members have been previously injured by RF radiation from cell towers, have been deprived of any remedy for their injuries, and have been deprived of any means of preventing further injury.  They have been deprived of their right to due process guaranteed to them under the Fifth and Fourteenth Amendments to the

United States Constitution. Additionally they have been deprived of their right to free speech and their right to petition the government for redress of grievances, guaranteed to them under the First Amendment. This Court is Plaintiffs' last resort to ensure their safety and their future from the harm perpetrated by Defendants.

21. Plaintiffs hereby seek a declaration that these laws, and any other laws that may be enacted by their City, their State, or the United States, that would deprive them of any means of protecting themselves from RF radiation and of any remedy for injury by such radiation, are unconstitutional, and to enjoin the enforcement of these laws.

## PARTIES

22. Plaintiff **Alliance** is an unincorporated organization of physicians, health care practitioners, psychotherapists, educators, artists and other citizens who reside and/or do business in the City of Santa Fe, and who have been personally and financially injured by wireless telecommunications facilities. The Alliance was formed in 2005 to educate the public about the health and environmental effects of electromagnetic radiation (EMR) from telecommunications facilities, and advocate for policies and laws that protect the public health and environment from such radiation. Many of its members are refugees from homes that they had to abandon when a cell tower was erected.

23. **Alliance member Janice R. Olch** is an architect. She and her daughter were injured by cell phone antennas on a water tank near her home in

Hondo Hills.  She sold her home and they moved to a more remote area in Santa Fe County where cell phone reception is poor and the lots are large enough that they are not exposed to WiFi signals from the neighbors.  **Alliance member John McPhee** is an official with the New Mexico Department of Health.  He and his wife were injured by a community wireless transmitter in 2005 while residing in the Eldorado Subdivision south of Santa Fe.  They moved back into the City in 2007 and took up residence on West Alameda Street.  When the cell towers on the hill above their house were upgraded to 4G, they both began to experience headaches, nausea, chronic insomnia and loud ringing in their ears, and his wife started having seizures.  Finally they purchased and moved into a house near Santa Fe High School, which gave them both relief and immediately reduced both the frequency and severity of his wife's seizures.  **Alliance member Forrest Reed** is a civil engineer and environmental planner who used to work for the City of Santa Fe.  She was injured in 2005 when Verizon Wireless concealed a cell tower, for which it had neither a building permit nor zoning permission, on the roof of a one-story building.  The building was and is just a few houses away from Ms. Reed, and four of the cell tower's antennas are aimed toward at her home.  Ms. Reed, who still lives in her home and cannot afford to move, hears the radiation, developed respiratory, neurological and cardiac problems after that cell tower was erected, and more recently has developed an unusual form of lung cancer.  **Alliance member Lynn Jacob** was a caseworker for the City of New York for 22 years.  She becomes irritable, tired and weak if she spends time in the vicinity of a cell tower or is

exposed to WiFi.  She has thyroid cancer which is presently stable and is afraid that any increase in radiation will encourage the growth and spread of her cancer.

**Alliance member Nina Zelevansky** is a retired psychotherapist and an artist who has lived in the City for many years.  Like most of the members of the Alliance, she is unable to use a cell phone because when she does, her face feels like it is on fire and she cannot think.  She is presently homeless because she has not been able to finding housing which is not exposed to WiFi and/or a cell tower.  **The Alliance also includes** a psychologist and author who was homeless for the same reason for five years, a world class athlete who was homeless for the same reason for eight years who now lives in a remote area south of the City, a physicist who lives in the City who had to leave his job at Los Alamos National Laboratory and almost became homeless for the same reason, and many others.  The Alliance also includes physicians who have patients who were injured and/or made homeless by cell towers.  Most members of the Alliance have had their mobility and access to City services and functions restricted by the new towers that have been erected pursuant to the Mayor's Proclamations.

24.     Plaintiff **Arthur Firstenberg** is the president of the Alliance and a homeowner and taxpayer within the City.  He is a refugee from cell tower radiation. Until 1996 he lived in an apartment on the top floor of a six-story building in Brooklyn, New York.  On November 14, 1996, Omnipoint Communications (now T-Mobile) began offering the first ever digital cell phone service in the city, provided by 600 newly erected cell towers, one of which was on the roof of a neighboring

building.  Immediately he was in agony and after November 18, 1996 was completely unable to eat or sleep.  During the night of November 21, 1996, he experienced paroxysmal laryngospasm:  his vocal cords went into spasm three times so that he could not take a breath in or out.  The next morning he left his apartment and the city to save his life.  The relief he experienced was immediate.  He moved upstate to the town of Norwich, New York and lived there for two years.  When a cell tower was built near his home in Norwich he moved to the tiny village of Mendocino, California, where he lived from 1999-2004.  When cell phone antennas were installed under the deck of a house across Mendocino Bay, aimed directly at the village, he had to move back into his car.  He arrived in Santa Fe in the summer of 2004 and rented a room in a house on Camino Principe.  One year later Verizon Wireless added antennas to an existing cell tower a few blocks away at 1214 Camino Carlos Rey and he was forced into his car again.  He lived in his car in Santa Fe for the next three years while searching for a place to live that did not threaten his life.  In addition to the aforementioned laryngospasm, his life-threatening injuries include cardiac arrhythmia and elevated cardiac enzymes, indicative of damage to cardiac and/or skeletal muscle.  His physician will testify to these facts.  He purchased his present home in 2008.  Several of the towers built under the Mayor's Proclamations have now restricted his mobility and his access to City services and functions: the new tower on the roof of the Convention Center denies him access to that building, and the new antenna aimed at Council Chambers restricts his access to City government; the new tower between the

Water Division and the Chocolate Maven denies him access to City offices and a popular restaurant; the new tower at Fort Marcy Park denies him access to that park and the recreation facilities therein; the new tower in front of the Genoveva Chavez Community Center denies him access to that recreation center as well as government functions and public meetings held therein.

25.     Firstenberg is president of the nonprofit organization Cellular Phone Task Force, which he co-founded in 1996 to call attention to the problem that had cost him his home and almost cost him his life.  Today he communicates with ten thousand individuals and five hundred organizations representing refugees from wireless telecommunications facilities.

26.     Plaintiff **Monika Steinhoff** is a homeowner and taxpayer within the City and an artist and owner of an art gallery.  She was first injured by wireless technology when her cell phone started causing her hand to become numb and gave her an odd discomfort in her ear.  In August 2010 she moved her art gallery to the Arcade on the Plaza but often was dizzy and nauseous there.  She was well at home, where there was no cell phone service, but at work, where she was exposed to more than 20 WiFi signals from neighbors, she was exhausted at the end of the day, had migraines and heart palpitations, and started having internal bleeding.  She also experienced severe insomnia.  She left in October 2010, moving the gallery to her house for several months.  In the spring of 2011, she moved her gallery to Guadalupe Street in the Railyard district, one block from Hotel Santa Fe.  Business and sales were good, but a cell tower was erected on the roof of Hotel Santa Fe in

2013.  She shielded the roof of her gallery as well as the large windows, which reduced the radiation.  But she still felt unwell inside, and worse outside in the street, and was forced to find yet another location for her gallery, on Canyon Road. Her doctor will testify that RF radiation is the primary cause of the aforementioned diagnoses, as well as the cause of her more recently elevated blood pressure. Several of the towers built under the Mayor's Proclamations have now restricted her mobility and her access to City services and functions: the new tower on the Convention Center denies her access to City Hall; she used to swim and work out at the Fort Marcy Complex but the new tower there denies her access; she is used to frequenting the Lensic Performing Arts Center for cultural and civic events at least once a month, but the new antennas across the street on the Sandoval Street Parking Garage have now made that impossible.

27.     Defendant **City of Santa Fe** is a home rule municipality organized and incorporated pursuant to the laws of the State of New Mexico.  Under these laws, the City is a zoning authority that controls all land uses within its borders and is obligated to protect the public health, safety and welfare.  As a result of both its exercise of control over land use and its failure to exercise control over land use, the City has caused injurious levels of RF radiation to blanket its population and has failed in its duty to protect the public health, safety and welfare as well as in its duty to protect the rights of its citizens under the New Mexico and United States Constitutions.

28.     Defendant **Hector Balderas** is the Attorney General of the State of New Mexico and is responsible for enforcing its laws.  Because the Wireless Consumer Advanced Infrastructure Investment Act, NMSA 1978 § 63-9I (2018) ("WCAIIA") contains no enforcement provisions, failure of the City to comply with its provisions could only be remedied by a mandamus action or other enforcement action by the Attorney General.  WCAIIA contravenes the obligation of the State of New Mexico under its Constitution to operate for the public good, to control pollution and to protect the public health, safety and general welfare.  As a result of WCAIIA, the State is causing injurious levels of RF radiation to blanket New Mexico and its beautiful environment, and is failing in its duty to protect the public health, safety and welfare as well as in its duty to protect the rights of its citizens under the New Mexico and United States Constitutions.

29.     Defendant **United States of America** is the sovereign trustee of natural national resources, including forests and wildlife.  Under its Constitution, the United States regulates interstate commerce.  Under its Constitution, the United States is obligated to promote the public welfare.  As a result of both its exercise of control over interstate commerce and its failure to exercise control over interstate commerce, the United States has caused injurious levels of RF radiation to blanket the nation, has substantially impaired its natural resources, has failed in its duty to promote the public welfare, and has deprived Plaintiffs of fundamental constitutional rights.  Plaintiffs may not be deprived of their life, liberty and property without due process of law.  U.S. Constitution, Amendment Five.

30.     This action is brought pursuant to the United States Constitution. It is authorized by Article III, Section 2, which extends the federal judicial power to all cases arising in equity under the Constitution and to controversies to which the United States is a party.  A controversy exists between Plaintiffs and Defendants because Defendants have placed Plaintiffs in a dangerous situation, continue to infringe upon Plaintiffs' constitutional rights, and have abrogated their duty of care to ensure Plaintiffs' reasonable safety, among other violations of law. Plaintiffs have no adequate remedy at law to redress the harms herein.

31.     This Court has jurisdiction under 28 U.S.C., § 1331 (federal question); 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act); 28 U.S.C. § 1343(a)(3), giving the federal district courts original jurisdiction of any civil action to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States; and 28 U.S.C. § 1367 (supplemental jurisdiction).  Plaintiffs' federal claims raise questions under the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* and Amendments One, Five, and Fourteen of the United States Constitution.

32.     Venue is proper in this judicial district by virtue of 28 U.S.C. § 1391(b). All Plaintiffs reside in this judicial district, all Defendants have offices in this judicial district, and the events, omissions and harms giving rise to this action arise in substantial part in this judicial district.

**STATEMENT OF FACTS**

33.     Wireless telecommunications facilities emit RF radiation, which penetrates into houses and endangers life and safety. RF radiation causes acute effects including headaches, dizziness, nausea, eye pain, insomnia, tachycardia, hypertension, irregular heartbeat, anxiety, depression, memory loss, nosebleeds, digestive problems, and ringing in the ears. RF radiation causes chronic illness including diabetes, cancer, and heart disease. The acute effects have driven an estimated 20 million people from their homes worldwide, based on government surveys and data from 500 organizations with whom Plaintiffs here correspond, and have created a large class of environmental refugees.

34.     When the City drafted its first Telecommunications Facilities Ordinance in 1998, it included protections from the dangers of cell towers. It required that the City:

    a.  "Ameliorate any impacts upon residents of the city of Santa Fe and the municipality of expanding needs for telecommunications facilities";

    b.  "Minimize any adverse impacts of towers and antennas on residential areas and land uses";

    c.  "Encourage the location of towers in nonresidential areas";

    d.  "Minimize the total number of towers throughout the community";

    e.  "Gather information and provide remedies for the public health and safety impacts of communication towers";

    f.  "Avoid potential damage to adjacent properties from towers;"

Santa Fe City Ord. No. 1998-16, § 15(F), (H), (I), (J), (N), and (O).

35.     The 1998 ordinance applied to "[a]ll towers or antennas located within the city limits whether upon private or public lands," Santa Fe City Ord. No. 1998-16, § 17.  Towers and antennas in residential or historic districts required a Special Exception and were not a permitted use in any zoning district.  There were application requirements, notice requirements, noise requirements, height limitations, and setback requirements.  A new tower had to be a minimum distance of one thousand feet from any existing tower.

36.     The ordinance provided that antennas and towers in the public rights-of-way had to comply with all of the same land use requirements as antennas and towers on private land, except that there was an additional requirement that the applicant had to obtain a lease from the City, and that in deciding whether to grant or deny the lease the City had to consider the "effects... on public health, safety and welfare," Ord. No. 1998-16, § 41(E).

37.     The Santa Fe Task Force on Microwave Antennas, formed in February 2000, worked with the City for several years to minimize the impact of cell towers on public health.  The Santa Fe Alliance for Public Health and Safety, a Plaintiff in this case, formed in 2005; its members have participated in every approval process and testified at every public hearing for every proposed ordinance and every telecommunications facility erected in Santa Fe from 2005 until the present day.  Arthur Firstenberg, a Plaintiff in this case, was appointed by the Mayor in 2007 to a

steering committee to advise the Information Technology and Telecommunications Department of the City of Santa Fe on the health effects of wireless Internet.

38.     Despite knowing that RF radiation is hazardous, and despite additional knowledge about these hazards being supplied to the City by a succession of citizens' groups and their experts, the City began in 2010 to deliberately dismantle the protections of the public health, safety, and welfare that it had encoded in the 1998 ordinance and to systematically eliminate every reference to the health effects of RF radiation from the City Code.  It revised Chapter 27 of the Santa Fe City Code ("Chapter 27") to exempt telecommunications facilities in the public rights-of-way from the land use regulations of Santa Fe City Code, Chapter 14 ("Chapter 14").  It revised Chapter 14 to eliminate the requirements that the City gather information and provide remedies for the health and safety impacts of communication towers.  The requirement to minimize "*any* adverse impacts of antennas and towers" was changed to "*land use* impacts of antennas and towers." Antennas, which were previously not a permitted use in *any* zoning district, were now made a permitted use in *all* zoning districts.  Leases were replaced with franchises, and franchisees no longer had to get approval of antennas on a site-by-site basis.

39.     Chapter 27, as revised in 2010, still required that applicants for wireless telecommunications facilities in the public rights-of-way provide specific information about their RF emissions; required that any subsequent increase in RF emissions be subject to approval by the City; required applicants to certify

compliance with the FCC's RF exposure guidelines; and authorized the City to retain an independent radio frequency engineer to verify such compliance. Exhibit C-2, attached hereto, §§ 27-2.13(F)(1)(c) and 27-2.13(O) (2010). However, in a pair of ordinances, adopted November 9, 2016 and August 30, 2017, the City repealed every one of those requirements, along with almost all notice, hearing, and application requirements, for telecommunications facilities in the public rights-of-way.

- New wireless facilities no longer require submittal of an application at all if they conform to existing design standards
- New facilities no longer require review by the Planning commission
- Facilities in historic districts no longer require review by the Historic Districts Review Board
- Information regarding radio frequency emission is no longer required
- Proof, or even self-certification, of compliance with the FCC's radio-frequency exposure guidelines is no longer required
- Public notice is no longer required
- Notice to neighbors of planned facilities is no longer required

Santa Fe City Ordinances No. 2016-42 and 2017-18.

40.    The only requirement left for putting telecommunications facilities on Santa Fe's streets and sidewalks is the possession of a franchise. Franchises will be awarded to all telecommunications providers on a non-discriminatory basis, and

franchisees will be permitted to erect unlimited numbers of antennas and towers wherever they please in the public rights-of-way with no public hearings, no public comment, no public notice, no notice to neighbors, no setback requirements, no certification of compliance with the FCC's safety regulations, and without even submitting an application to the City. All they will have to do under the amended City Code is tell the City that their facilities will comply with design guidelines that the City will have adopted. Santa Fe City Code § 27-2.19(C)(1)(a) (2018). But even this minimal requirement is no longer being enforced because under the new State law, WCAIIA, such facilities are exempt from *all* land use requirements. The result is a complete free-for-all. City residents will have no warning before cell tower transmitters suddenly appear in front of their homes and businesses or outside their children's bedroom windows and school classrooms, and they will have no recourse.

41. At the present time, almost all wireless telecommunications facilities in Santa Fe are on private property or City-owned property, and not in the public rights-of-way where people walk. ***None are located in front of homes and businesses.*** Because of previous litigation and the invalidation of successive versions of Chapter 27 by successive court decisions, no applications for telecommunications facilities in the public rights-of-way were processed by the City until 2018.

42.     On December 8, 2016, Plaintiffs here, Alliance and Firstenberg, filed a Complaint for Declaratory Relief in state court, Case No. D-101-CV-2016-02801 in the First Judicial District of New Mexico, asking the court to issue an order declaring Chapter 27 as amended by Ordinance No. 2016-42 void and unenforceable and asking for injunctive relief.  The Complaint was dismissed by the court as not ripe for review because no franchises had yet been awarded.

43.     On November 21, 2017, the threat to Plaintiffs' lives was made more immediate when Mayor Javier Gonzales signed the first of three Proclamation declaring a "State of Emergency" due to bad cell phone service.  The Proclamations suspended the Land Development Code, including public notice requirements, with respect to telecommunications facilities on City-owned property.  Seven cell towers have been built under the Proclamations—one at Fire Station 4 at 1130 Arroyo Chamiso Road; one at the City's Water Division at 801 West San Mateo Road in the driveway between the Water Division and the Chocolate Maven; one at Fort Marcy Park next to the Fort Marcy Complex recreation center; one in the parking lot in front of the Genoveva Chavez Community Center, 3221 Rodeo Road; one on the roof of the Sandoval Street Parking Garage at 220 West San Francisco Street: one at the City's water treatment plant at 1780 Upper Canyon Road; and one at 201 West Marcy Street on the roof of the elevator structure of the Santa Fe Community Convention Center's parking garage, next to City Hall.  One of the antennas on top

of the elevator structure is aimed directly at Council Chambers, endangering the health of everyone who wants to participate in City government.

44.     On January 11, 2018, Plaintiffs filed a complaint in this Federal District Court, Case No. 1:18-cv-00032, asking the Court to intervene to protect their homes and properties and to protect the public health, safety, and welfare that was immediately endangered.

45.     On April 6, 2018, the Court dismissed the complaint without prejudice for lack of jurisdiction.  The Court ruled that Plaintiffs had not alleged sufficient facts to support standing.

46.     On May 7, 2018, Plaintiffs filed an amended complaint and a Rule 59 motion asking the Court to reconsider and reopen its judgment of April 6, 2018, having added additional allegations and greater detail to remedy the deficiencies pointed out by the Court.

47.     On May 9, 2018, the factual and legal situation changed.  The City awarded franchises to five telecommunications companies under the new City ordinances.  At the public hearing, City officials discussed the implications of the new State law, the Wireless Consumer Advanced Infrastructure Investment Act, NMSA 1978 § 63-9I ("WCAIIA"), which was signed on March 2, 2018 and was due to go into effect on September 1, 2018.  Large portions of the City's new ordinances, they said, were being preempted.  At the same time, a number of bills were being introduced into Congress at the Federal level, whose purpose was to prohibit States

and municipalities nationwide from regulating wireless telecommunications facilities in the public rights-of-way at all.

48. On May 23, 2018, since the Court had dismissed their complaint without prejudice, and because either the State of New Mexico *or* its Attorney General was now a necessary party, Plaintiffs withdrew their Rule 59 motion and prepared to draft this fresh complaint, incorporating the new set of facts and laws and adding both the New Mexico Attorney General and the United States as defendants.

49. The installation of 5G throughout Santa Fe is imminent. Cyber Mesa, one of the new franchisees, intends to have 5G operating at the four corners of the Santa Fe Plaza by December 31, 2018; Mobilitie, another of the new franchisees and contractor for Sprint, is preparing to install the first four of hundreds of lamppost installations on the sidewalks of Santa Fe as this complaint is being filed; and the City is right now processing additional applications for franchises from additional telecommunications providers.

50. Plaintiffs file this new complaint today against the City of Santa Fe, the New Mexico Attorney General, and the United States of America. Since both the City and the State have now passed laws removing all public protection, all public process, and all notice requirements for injurious facilities in the public rights-of-way, both the City and the State or its Attorney General are necessary parties defendant. In addition, Section 704 of the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(iv) and (v) prohibits states and municipalities from regulating

telecommunications facilities on the basis of environment, which has been interpreted as meaning health. Injured parties, such as Plaintiffs here, have been foreclosed from filing state tort actions for injury by such facilities, and no substitute federal remedy has been provided. Moreover, several bills have been introduced into Congress that would deprive states and local governments nationwide of the power to apply land use regulations to wireless facilities in the public rights way at all, and the FCC has adopted regulations exempting wireless facilities in the public rights of way nationwide from the National Environmental Policy Act and the National Historic Preservation Act.

51.     Together, the new City Ordinances (No. 2016-42 and No. 2017-18), the new State Act (WCAIIA), and Section 704 remove all public protection from injurious facilities in the public rights-of-way and deprive injured parties of any remedy for their injuries. The new FCC regulations compound this denial of constitutional rights, and the pending Congressional bills would compound it even more. Plaintiffs are such injured parties. Plaintiffs ask the Court to issue an emergency injunction and restraining order preventing the construction of an entirely new generation of radiating facilities on the sidewalks throughout Santa Fe, directly in front of homes and businesses, while this case goes to trial. Plaintiffs will prove, through the testimony of experts in various fields of medicine and science, that these facilities pose an immediate threat to the health, wellbeing and future of all Santa Fe residents.

52.     Attached hereto for the Court's convenience are Chapter 27 as adopted in 1998 (Exhibit C-1); Chapter 27 as revised in 2010 (Exhibit C-2); City Ordinance No. 2016-42 (Exhibit C-3); City Ordinance No. 2017-18 (Exhibit C-4); the Mayor's first proclamation of emergency (Exhibit C-5); the Mayor's second proclamation of emergency (Exhibit C-6); the Mayor's third proclamation of emergency (Exhibit C-7); The Wireless Consumer Advanced Infrastructure Investment Act (Exhibit C-8); and 47 U.S.C. § 332(c)(7)(B)(iv) and (v) (Exhibit C-9).

## LEGAL CLAIMS

53.     The City, as a zoning authority, has the responsibility to regulate telecommunications facilities for the public good.  In fulfilling this responsibility, the City may not violate the fundamental Constitutional rights of its citizens.  Any State law or federal law that requires the City to violate the Constitution, is itself unconstitutional, and therefore is not a bar to any of Plaintiffs' claims against the City.

## FIRST CAUSE OF ACTION
(U.S.  Constitution, Amendment Fourteen,
and New Mexico Constitution, Article II, Section 18)

### CHAPTER 27 AS AMENDED, AND WCAIIA, VIOLATE PROCEDURAL AND SUBSTANTIVE DUE PROCESS

54.     All previous paragraphs are incorporated herein by reference.

55.     Under Chapter 27 as amended by Ordinances 2016-42 and 2017-18, and also under WCAIIA, the construction of wireless telecommunications facilities on private property in all zoning districts is subject to at least notice and comment prior to construction, and an appeals process afterwards, but the construction of

most telecommunications facilities in the public rights-of-way in the same districts are not subject to notice, comment, or an appeals process. Notice and an opportunity to be heard are the minimum requirements for Procedural Due Process.

56.     Chapter 27 as amended, and WCAIIA, also violate Substantive Due Process. The U.S. Constitution and the New Mexico Constitution guarantee the fundamental right of citizens to be free from government actions that harm life, liberty, and property. These inherent and inalienable rights reflect a basic societal contract. The rights to life, liberty, and property have evolved and continue to evolve as technological advances pose new threats to these fundamental rights.

57.     In enacting Ordinances Nos. 2016-42 and 2017-18, and in enacting WCAIIA, the City has determined to authorize, and the State has determined to require, the unrestrained and unprotected siting of wireless telecommunications facilities in front of thousands of residences and businesses despite knowing that the results of their acts endanger Plaintiffs' lives, liberties, and properties. Plaintiffs will no longer be safe at home or work or while traveling on the public streets.

58.     For at least the past twenty years, the City has known about the danger to Plaintiffs' health and safety created by RF radiation, yet has repealed all protections from that danger. For at least the past ten years, the State has known about the danger. These deliberate actions by the City and State have resulted in injurious levels of RF radiation, which deprive Plaintiffs of their fundamental rights to life, liberty and property, their capacity to earn a living, safely raise families, and

provide for their basic human needs. The City and State have each acted with deliberate indifference to the known danger. Given that the dangers are so substantial, the City's and State's deliberate indifference shocks the conscience.

59. The actions of the City and the State, separately and jointly, have deprived Plaintiffs of the reasonable expectation of a home without radiation. These acts of the City and State cannot and do not operate to secure a more compelling state interest than Plaintiffs' fundamental, constitutionally guaranteed rights to life, liberty, and property.

**SECOND CAUSE OF ACTION**
(U.S. Constitution, Amendment Fourteen,
and New Mexico Constitution, Article II, Section 18)

**THE MAYOR'S PROCLAMATIONS OF EMERGENCY VIOLATED DUE PROCESS**

60. All previous paragraphs are incorporated herein by reference.

61. Under the Mayor's Proclamations of Emergency, the City suspended all land use regulations for cell towers on City-owned land for six months, regardless of height, aesthetics, zoning district, proximity to homes or businesses, or anything else, and regardless of whether they conformed to design standards or not. Under the Proclamations of Emergency, the City not only suspended land use regulations but signed a contract with Verizon Wireless for the erection of wireless telecommunications facilities on City-owned land without notice to anyone or an opportunity for anyone to be heard, as required by City zoning regulations and the U.S. and New Mexico Constitutions.

## THIRD CAUSE OF ACTION
(U.S. Constitution, Amendments Five and Fourteen)

### CHAPTER 27 AS AMENDED AND WCAIIA
### ARE AN UNCONSTITUTIONAL TAKING

62.     All previous paragraphs are incorporated herein by reference.

63.     In enacting Ordinances Nos. 2016-42 and 2017-18, and in enacting WCAIIA, the City has determined to award, and the State has determine to require, franchises authorizing the placement of wireless telecommunications facilities anywhere on the streets and sidewalks of Santa Fe without regard to their proximity to homes and businesses.

64.     The placement of wireless telecommunications facilities on the sidewalk directly in front of Plaintiffs' homes and businesses will render their homes and businesses uninhabitable and unusable.

65.     These actions by the City and State, separately and jointly, constitute a taking without just compensation, in violation of the Fifth and Fourteenth Amendments.

## FOURTH CAUSE OF ACTION
(U.S. Constitution, Amendment One)

### CHAPTER 27 AS AMENDED, WCAIIA, AND SECTION 704
### VIOLATE THE RIGHT TO PETITION

66.     All previous paragraphs are incorporated herein by reference.

67.     Section 27 as amended and WCAIIA deprive people threatened with injury by RF radiation from wireless telecommunications facilities of the right to

protest such facilities, receive notice before such facilities are erected, or exercise their due process rights before such facilities are erected.

68.     Section 704 deprives people of the right to testify about such injury, and deprives their local governments of the power to protect them from the injurious effects of RF radiation.  Section 704 deprives people injured, sickened, and/or killed by such radiation of access to state courts for redress for their injuries, and provides them no substitute federal remedy.

**69.**     Separately and collectively, Section 27 as amended, WCAIIA, and Section 704 violate the First Amendment's guarantee of the Right to Petition the Government for Redress of Grievances.

### FIFTH CAUSE OF ACTION
(NMSA 1978 § 3-21-1(A) (2007))

#### THE CITY HAS ABDICATED ITS RESPONSIBILITIES AS A ZONING AUTHORITY

70.     All previous paragraphs are incorporated herein by reference.

71.     Cities have traditionally regulated utilities that occupy their rights-of-way in two ways: either by site-specific leases, by which the city retains control over the location of proposed facilities, or by franchises, by which cities give up that control.

72.     In amending Chapter 27 by Ordinances 2016-42 and 2017-18, the City of Santa Fe not only has chosen franchises over leases, but has effectively eliminated all other land use regulations, such that an application for a franchise is the only requirement before a telecommunications company can begin erecting unlimited numbers of telecommunications facilities in the City's public rights-of-

way.  The City has enacted an all-or-nothing ordinance.  If the City grants a franchise, the applicant can erect unlimited numbers of antennas and towers without further interference.  If the City denies a franchise, the applicant cannot operate in the City.

73.    Under the federal Telecommunications Act ("TCA"), 47 U.S.C.  §§ 253 and 332(c)(7)(B)(i)(I) and (II), a municipality's regulations may not (a) have the effect of denying telecommunications service, and (b) may not discriminate between providers of functionally equivalent services.  Therefore, the way Chapter 27 is now structured, the denial of any franchise to any telecommunications company would violate federal law.  The City has given up all control over its streets and sidewalks.

74.    State law provides that the City "is a zoning authority" for the purpose of "promoting health, safety, morals or the general welfare." NMSA 1978, § 3-21-1(A) (2007).  Furthermore, the City Code states as follows:  "The purposes of Chapter 14 are to: (A) implement the purposes of the general plan, including guiding and accomplishing a coordinated, adjusted and harmonious development of Santa Fe that will best promote health, safety, order, convenience, prosperity and the general welfare . . . ."  Santa Fe City Code § 14-1.3(A) (2011).  In addition, the City Code provides that "[t]he provisions of Chapter 14 apply to all land, buildings and other structures, and their uses, located within the corporate limits of Santa Fe, including land owned by local, county, state or federal agencies to the extent allowed by law." Santa Fe City Code § 14-1.6 (2011).

75. The public rights of way in Santa Fe are enjoyed by all residents, and nearly every home or business has frontage on one or more public rights of way. The evisceration of land use regulations and zoning regarding public rights of way renders meaningless laws intended to protect the public health and safety.

## SIXTH CAUSE OF ACTION
(NMSA 1978, Section 3-21-1(B)(2) (2007))

### CHAPTER 27 AS AMENDED PROVIDES FOR
### NON-UNIFORM ZONING REGULATIONS

76. All previous paragraphs are incorporated herein by reference.

77. State law provides that the City as a zoning authority may "regulate or restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land in each district. *All such regulations shall be uniform for each class or kind of buildings within each district*…." NMSA 1978, Section 3-21-1(B)(2) (2007). (Emphasis added).

78. The purpose of uniform zoning laws is to protect private property and maintain order. Therefore "industries and structures likely to create nuisances" are excluded from residential districts. *Village of Euclid v. Amber Realty Co.*, 272 U.S. 365, 388 (1926). A person who purchases a home in a residential district has the right to rely on a single, uniform set of zoning regulations that apply throughout that district, not just on three sides of his or her property but on *all* sides. Setback requirements, for example, that were enacted for reasons of health and safety would become meaningless if they applied only on three sides of a person's property and did not apply on the side abutting the public right-of-way.

79.     Under Chapter 27 as amended by Ordinances Nos. 2016-42 and 2017-18 and under WCAIIA, telecommunications facilities in the public rights-of-way are exempt from the zoning regulations in SFCC 1987, Section 14-6.2(E) (2011) that apply to all other telecommunications facilities, as well as from the zoning regulations in SFCC 1987, Section 14-5.2 that apply to all other buildings and structures in historic districts.   Chapter 27 as amended therefore provides two-tier zoning regulations for every district in Santa Fe: one set of regulations that apply to structures on private property, and a second, more relaxed set of regulations that apply to structures in the public rights-of-way.

80.     Under Chapter 27 as amended, a tower or antenna on private land abutting one's property requires a site-specific application containing all the elements required by Section 14-6.2(E) including: notification of all neighbors within 200 feet of the antenna or tower; compliance with setback requirements from property lines; for new towers in a residential district, an early neighborhood notification meeting and a public hearing before the planning commission; and for towers and antennas in a historic district, a public hearing before the historic districts review board.  A tower or antenna in the public right-of-way in the same district abutting the same property requires neither a separate application, notification of neighbors, setback requirements from property lines, early neighborhood notification meeting, nor public hearing.

81.     Chapter 27 as amended violates NMSA 1978, Section 3-21-1(B)(2) (2007).

## SEVENTH CAUSE OF ACTION
### (N.M. Const., Article II, Section 4)

82.     All previous paragraphs are incorporated herein by reference.

83.     Article II, Section 4 of the New Mexico Constitution states: "All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness."

### THE RIGHT TO PROTECTION OF PROPERTY

84.     Ordinances Nos. 2016-42 and 2017-18 and WCAIIA deprive property owners of prior notice, an opportunity to comment and/or testify at a public hearing, a minimum setback distance from their property lines, and other protections from dangerous facilities being built on the sidewalk in front of their house.

85.     Chapter 27 as amended by Ordinances Nos. 2016-42 and 2017-18 and WCAIIA, separately and jointly, violate the inalienable right to protect property possessed by all persons under Article II, Section 4 of the New Mexico Constitution.

### THE RIGHT TO SAFETY AND THE RIGHT TO DEFEND LIFE

86.     Chapter 27 as amended and WCAIIA repeal all previous restraints on the pollution of private property with types of radiation proven harmful to life.

87.     Chapter 27 as amended by Ordinances Nos. 2016-42 and 2017-18 and WCAIIA, separately and jointly, violate the inalienable rights to safety and to defend life possessed by all persons under Article II, Section 4 of the New Mexico Constitution.

## EIGHTH CAUSE OF ACTION
### (N.M. Const., Art. XX, § 21)

### CHAPTER 27 AS AMENDED AND WCAIIA
### VIOLATE POLLUTION CONTROL REQUIREMENTS

88. All previous paragraphs are incorporated herein by reference.

89. Article XX, section 21 of the New Mexico Constitution is titled "Pollution control" and states: "The protection of the state's beautiful and healthful environment is hereby declared to be of fundamental importance to the public interest, health, safety and the general welfare. The legislature shall provide for control of pollution and control of despoilment of the air, water and other natural resources of this state, consistent with the use and development of these resources for the maximum benefit of the people."

90. Ordinances No. 2016-42 and 2017-18 and WCAIIA repeal all previous restraints on the pollution of the environment with types of radiation proven to be harmful to life and safety. It even repeals self-certification of compliance with the non-mandatory safety guidelines set by the FCC for human exposure to RF radiation.

91. Chapter 27 as amended and WCAIIA, separately and jointly, abdicate the responsibility of government under Article XX, section 21 of the New Mexico Constitution to control pollution.

# NINTH CAUSE OF ACTION
(NMSA 1978, §§ 3-21-1(A) and 3-21-5(A)(3) (1970)),
SFCC §§ 14-1.3 and 14-4.1(A)(2))

## CHAPTER 27 AS AMENDED AND WCAIIA
### DAMAGE HEALTH, SAFETY, AND THE GENERAL WELFARE

92.     All previous paragraphs are incorporated herein by reference.

93.     The protection of health, safety, and welfare is so fundamental to the function of government that this function is encoded in numerous provisions of law at every government level.

94.     Section 3-21-1(A) of the New Mexico Statutes states: "For the purpose of promoting health, safety, morals or the general welfare, a county or municipality is a zoning authority…."

95.     Section 3-21-5(A)(3) of the New Mexico Statutes states:  "The regulations and restrictions of the county or municipal zoning authority are to be in accordance with a comprehensive plan and be designed to… (3) promote health and the general welfare."

96.     Section 14-1.3 of the Santa Fe City Code states that "[T]he purposes of chapter 14 are to:  (A) implement the purposes of the general plan, including guiding and accomplishing a coordinated, adjusted and harmonious development of Santa Fe that will best promote health, safety, order, convenience, prosperity and the general welfare…."

97.     Section 14-4.1(A)(2) of the Code states that the "regulations for the development and use of structures and land" in the City's zoning districts "are made

in accordance with the general plan and are designed to … promote health and the general welfare…"

98.    Chapter 27 as amended and WCAIIA, separately and jointly, damage health, safety, and the general welfare, in violation of the fundamental responsibilities of government and numerous State and City laws.

**TENTH CAUSE OF ACTION**
(NMSA 1978 § 3-21-6(B) (1970))

**ORDINANCES 2016-42 AND 2017-18**
**ADOPTED ZONING CHANGES WITHOUT NOTICE TO NEIGHBORS**

99.    All previous paragraphs are incorporated herein by reference.

100.    Section 3-21-6(B) of the New Mexico Statutes requires that "[w]henever a change in zoning is proposed for an area of more than one block, notice of the public hearing shall be mailed by first class mail to the owners, as shown by the records of the county treasurer, of lots or [of] land within the area proposed to be changed by a zoning regulation and within one hundred feet, excluding public right-of-way, of the area proposed to be changed by zoning regulation."

101.    Ordinances 2016-42 and 2017-18 effected changes in zoning for public rights-of-way without any notice to owners of lots of land within one hundred feet of such rights of way, in violation of NMSA 1978, § 3-21-6(B) (1970).

## ELEVENTH CAUSE OF ACTION
(Santa Fe City Charter, § 2.02)

### CHAPTER 27 AS AMENDED
### VIOLATES THE HUMAN AND CIVIL RIGHTS OF THE RESIDENTS OF SANTA FE

102.    All previous paragraphs are incorporated herein by reference.

103.    Chapter 27 as amended deprives the residents of Santa Fe of the ability to protect themselves against types of radiation proven to be harmful to life and safety, contrary to Section 2.02 of the Santa Fe City Charter, which states that "[t]he human and civil rights of the residents of Santa Fe *are inviolate* and *shall not be diminished or otherwise infringed*."  (Emphasis added).

104.    Many residents of Santa Fe, including Plaintiffs and their members, are refugees from RF radiation elsewhere.  Their ability to remain healthy, earn a living, raise their families, provide for their needs, and continue to live in Santa Fe is dependent on non-exposure to RF radiation.

105.    Chapter 27 as amended deprives Plaintiffs of their human and civil rights in violation of section 2.02 of the Santa Fe City Charter.

## TWELFTH CAUSE OF ACTION
(Santa Fe City Charter, § 2.03)

### CHAPTER 27 AS AMENDED
### DAMAGES THE CITY'S ENVIRONMENT

106.    All previous paragraphs are incorporated herein by reference.

107.    Section 2.03 of the Santa Fe City Charter, titled "Environmental protection," requires that "the governing body shall protect, preserve and enhance

the city's natural endowments… and promote and maintain an aesthetic and humane urban environment."

108.     Chapter 27 as amended damages the City's environment in violation of section 2.03 of the Santa Fe City Charter.

## THIRTEENTH CAUSE OF ACTION
(NMSA 1978, § 30-8-1 (1963) and SFCC §§ 10-9.3 and 23-1.2(B)(3))

### CHAPTER 27 AS AMENDED
### PROVIDES FOR THE CREATION OF PUBLIC NUISANCES

109.     All previous paragraphs are incorporated herein by reference.

110.     The amendments to Chapter 27 were adopted without lawful authority.

111.     Under NMSA 1978, § 30-8-1, a public nuisance is a misdemeanor that consists of "knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either:  A.  injurious to public health, safety, morals or welfare; or  B.  interferes with the exercise and enjoyment of public rights, including the right to use public property."

112.     Under Section 10-9.3(E) of the Santa Fe City Code, a public nuisance as "knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either (1) Injurious to public health, safety, morals or welfare; or (2) Interferes with the exercise and enjoyment of public rights, including the right to use public or private property."

113.     Under Section 23-1.2(B)(3) of the Santa Fe City Code, a public nuisance is "any activity, function, status, or the result of such activity, function, or

status whether participated in by one person or several, whether caused by machines, persons, or other devices, which affects the health, safety, and welfare of an individual, a neighborhood or community and degrades the quality of life for such individual, neighborhood or community," without regard for whether the nuisance was created by lawful authority.

114.    Section 10-9.2 of the Santa Fe City Code requires "[t]he abatement of public nuisances for the protection of public health, safety, and welfare…."

115.    Chapter 27 as amended provides for the creation of public nuisances, not their abatement, in violation of State and City law.

## FOURTEENTH CAUSE OF ACTION
(Ultra Vires)

### MAYOR'S PROCLAMATIONS

116.    All previous paragraphs are incorporated herein by reference.

117.    The Mayor's Proclamations fall beyond the scope of his authority under the City Code, the City Charter, and State law.

118.    The Mayor may proclaim a state of emergency pursuant to Section 20-1 of the City Code, the Riot Control Ordinance, if he "determines that a public disorder, riot, disaster or emergency exists in the municipality."  Once an emergency is declared, the Mayor is authorized to "prohibit . . . activities the mayor reasonably believes should be prohibited to help maintain life, property or the public peace."  Acts that may be so prohibited include being on the street after curfew, *see* § 20-1.2(A); any designated number of people from assembling or gathering, *see* § 20-1.2(B); the manufacture, use, or transportation of explosives, *see*

§ 20-1.2(C); the transportation, possession or use of combustible materials except for normal home or commercial use, *see* § 20-1.2(D); the possession of firearms in public, *see* § 20.1-2(E); the sale of alcoholic beverages, *see* § 20.1-2(F); or the use of designated streets of highways. *See* § 20.1-2(G). This authority does not include ordering the installation of wireless telecommunications facilities in public rights of way while land use regulations are suspended. The fire chief and two deputy police chiefs stated to the media that there is no emergency and no interruption of police of fire service due to insufficient telecommunications facilities. Section 20-1.4 of the Santa Fe City Code provides that a state of emergency "terminates automatically at noon on the third day after it becomes effective unless sooner terminated by proclamation of the mayor." The Mayor is not authorized to declare that any state of emergency will last for six months.

119. Section 5.01 of the City Charter and Section 2-1.3 of the City Code command the Mayor to "cause the ordinances and regulations of the city to be faithfully and constantly obeyed," not to unilaterally suspend them. They allow the Mayor to "perform other duties compatible with the nature of the office as the governing body may from time to time require," not as he unilaterally may decide. They give the Mayor "the power conferred on the sheriffs of counties to suppress disorders and keep the peace"; the sheriffs are not conferred with the authority to order cell towers to be built.

120. The Proclamations are null and void.

## FIFTEENTH CAUSE OF ACTION
(Injunctive Relief)

### CHAPTER 27 AND WCAIIA

121.    All previous paragraphs are incorporated herein by reference.

122.    The enforcement of Chapter 27 as amended and WCAIIA should be preliminarily and permanently enjoined because of violations of City, State, and Federal laws, charter, and constitutions.

123.    Plaintiffs and their members include persons previously physically injured and/or deprived of their homes and businesses by RF radiation from wireless telecommunications facilities.  Until now they have enjoyed protection from further injury because such facilities have not been permitted in the public rights-of-way close to homes and businesses.  Plaintiffs have already been further injured by the seven towers erected under the unlawful mayoral proclamations, and are threatened with more serious injury by the imminent erection of such facilities on the streets and sidewalks of Santa Fe in front of or in close proximity to their homes and businesses pursuant to chapter 27 as amended and WCAIIA.

124.    Absent injunctive relief, citizens will have close-range RF radiation coming into their homes and bodies without notice, resulting in irreparable harm that is not remediable by monetary damages.

## SIXTEENTH CAUSE OF ACTION
(Injunctive relief)

### MAYOR'S PROCLAMATIONS

125.  All previous paragraphs are incorporated herein by reference.

126.  Under the Mayor's Proclamations of Emergency, without any public process whatsoever and in total disregard of the Land Development Code, a contract was signed with Verizon Wireless, under which seven towers were erected on public property. The fact that the City subsequently conducted *pro forma* public proceedings on those seven towers does not legitimize a contract entered into illegally, nor legalize the seven towers erected without due process.

127.  The contract with Verizon should be declared void, and operation of the seven towers built under that contract should be preliminarily and permanently enjoined.

## SEVENTEENTH CAUSE OF ACTION

### "ENVIRONMENT" DOES NOT MEAN "HEALTH" IN SECTION 704 OF THE TELECOMMUNICATIONS ACT OF 1996

128.  All previous paragraphs are incorporated herein by reference.

129.  Section 704 of the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(iv) ("Section 704"), prohibits states from adopting stricter regulations than the FCC regarding "the environmental effects of RF radiation."

130.  If Congress had meant health it would have said so plainly.

131.  The question of whether "environment" means health in Section 704 has never been litigated.  According to the common meaning of the words, as

defined in Merriam-Webster's dictionary, "environment" does not mean or include

"health."[1]  If environment is interpreted to mean health in Section 704, this raises

serious questions as to the constitutionality of Section 704.  Therefore courts should

interpret "environment" *not* to mean "health" per Webster's dictionary so as to avoid

the serious questions as to the constitutionality of Section 704.[2]

132.    Section 704 is not a bar to any of Plaintiffs' Claims for Relief against

the City because by plain language "environment" does not mean "health."

**EIGHTEENTH CAUSE OF ACTION**
(U.S. CONSTITUTION, AMENDMENT FIVE)

**SECTION 704 OF THE TELECOMMUNICATIONS ACT OF 1996,
47 U.S.C. § 332(C)(7)(B)(IV) AND (V)**

133.    All previous paragraphs are incorporated herein by reference.

134.    The FCC has no statutory authority over human health and its RF

exposure guidelines are neither mandatory nor enforceable.

135.    The FCC has stated repeatedly that its RF exposure guidelines are

procedural only and serve only to determine whether an FCC licensee must file an

Environmental Assessment or not.  Non-mandatory regulations cannot have

---

[1] "**environment**  1a.  The totality of the natural world, often excluding humans."  *The American Heritage Dictionary*, Fifth Edition 596 (2011);
   "**environmental**  1.  Relating or associated with the environment.  2.  Relating to or concerned with the impact of human activities on the natural world."  *Id.* at p. 596.
   "**health**  1.  The overall condition of an organism at a given time."  *Id.* at p. 810.

[2] Even though Plaintiffs' position is that the plain meaning of the word "environment"—which does not include "health"—is applicable to Section 704, this in no way is to be construed to mean that destroying the environment survives constitutional scrutiny.  *See Juliana v. United States*, 217 F. Supp. 3d 1224, 1261 (D. Or. 2016):

> This action is of a different order than the typical environmental case. It alleges that defendants' actions and inactions—whether or not they violate any specific statutory duty—have so profoundly damaged our home planet that they threaten plaintiffs' fundamental constitutional rights to life and liberty.

preemptive effect. Yet, Section 704 gives these regulations preemptive authority, prohibiting States and local governments from adopting any regulations more stringent than those adopted by the FCC.

136.   Section 704 prohibits States and local governments from providing any remedy for injury by RF radiation without providing a substitute federal remedy. This prohibition violates Substantive Due Process because it forecloses any and all remedies for injury by RF radiation.

137.   Section 704 is not a bar to any of Plaintiffs' Claims for Relief against the City because Section 704 violates the Fifth Amendment.

**NINETEENTH CAUSE OF ACTION**
(U.S. Constitution, Amendment One – Freedom of Speech)

**SECTION 704 OF THE TELECOMMUNICATIONS ACT OF 1996,
47 U.S.C. § 332(C)(7)(B)(IV) AND (V)**

138.   All previous paragraphs are incorporated herein by reference.

139.   Section 704 prohibits States and local governments from regulating RF radiation *on the basis of* its environmental effects.

140.   If the public gives voice to their concerns about RF radiation from a proposed telecommunications facility and their city council subsequently denies the application, Section 704 provides that the applicant can "commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v).  *See Cellular Telephone Company v. Town of Oyster Bay*, 166 F.3d 490, 495 (2nd Cir. 1999) ("A review of the record before us of the two hearings reveals that the bulk of the testimony addressed citizens' fears of adverse health effects from the cell sites…").

141.    If a city councilor gives voice to his or her concerns about RF radiation, the telecommunications company can likewise sue the city in any court of competent jurisdiction.  *See T-Mobile Northeast LLC v. Town of Ramapo*, 701 F.Supp.2d 446, 460 (S.D.N.Y.  2009):

> "[T]he Town has now admitted that one of the Planning Board's three stated reasons for denying T–Mobile's application was that the proposal raised health concerns… In Planning Board hearings on July 11, September 12, and October 17, 2006, town residents repeatedly spoke of their concern that T–Mobile's proposed facility would create a health hazard… The Court has no trouble concluding that the Town's decision was at least partly based on the environmental effects of the proposed tower's radio frequency emissions…

142.    This prohibition is nothing more than a burden on the content of speech.

143.    Section 704 is not a bar to any of Plaintiffs' Claims for Relief against the City because Section 704 violates the First Amendment right to Free Speech.

## TWENTIETH CAUSE OF ACTION
(First Amendment – Right to Petition)

### SECTION 704 OF THE TELECOMMUNICATIONS ACT OF 1996, 47 U.S.C. § 332(C)(7)(B)(IV) AND (V)

144.    All previous paragraphs are incorporated herein by reference.

145.    Section 704 bars deprives persons threatened with injury of the right to be notified, of the right to participate in the decision, of the right to protest that decision, of the right to appeal that decision, and, when they are injured, of the right to tort relief or any remedy whatsoever for their injuries.

146. Section 704 is not a bar to any of Plaintiffs' Claims for Relief against the City because Section 704 violates the First Amendment Right to Petition the Government for Redress of Grievances.

## TWENTY-FIRST CAUSE OF ACTION
(Injunctive Relief)

147. All previous paragraphs are incorporated herein by reference.

148. Pending before Congress right now are a number of bills, including Senate Bill 3759, designed to streamline the deployment of 5G by exempting wireless facilities in the public rights-of-way from land use regulations nationwide.

149. The passage of any such federal bill would work the same violations of Free Speech, Due Process and the Right to Petition as the amended Chapter 27, WCAIIA, and Section 704.

150. The United States should be enjoined from passing or enforcing any bill that declares that local land use regulations do not apply to all wireless telecommunications facilities located in the public rights-of-way.

## TWENTY-SECOND CAUSE OF ACTION
(Injunctive Relief)

### SECTION 704 OF THE TELECOMMUNICATIONS ACT OF 1996, 47 U.S.C. § 332(C)(7)(B)(IV) AND (V)

151. All previous paragraphs are incorporated herein by reference.

152. The operation of 47 U.S.C. § 332(c)(7)(B)(iv), which prohibits the consideration of environmental and health effects, should be temporarily and permanently enjoined.

153.    The operation of 47 U.S.C. § 332(c)(7)(B)(v), which provides that any telecommunications company that is adversely affected by a local government's regulation of cell towers on the basis of health may be heard in any court of competent jurisdiction on an expedited basis—but that any citizen who is adversely affected by a local government's decision *not* to regulate cell towers on the basis of health may not be heard in any court whatsoever—should be temporarily and permanently enjoined.

**REQUESTS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court issue an Order and Judgment:

1.    Declaring that Chapter 27 as amended by Ordinances Nos. 2016-42 and 2017-18 and WCAIIA, individually and jointly, violate the Procedural and Substantive Due Process requirements of the United States and New Mexico Constitutions.

2.    Declaring that the Mayor's Proclamations of Emergency violated Procedural and Substantive Due Process.

3.    Declaring that Chapter 27 as amended and WCAIIA, individually and jointly, are a taking without just compensation, in violation of the Fifth and Fourteenth Amendments.

4.    Declaring that by requiring franchises instead of leases, the City has unlawfully abdicated its responsibilities as a zoning authority.

5. Declaring that Chapter 27 as amended provides non-uniform zoning regulations for every zoning district, in violation of state law.

6. Declaring that Chapter 27 as amended and WCAIIA, individually and jointly, violate the inalienable right to safety guaranteed in New Mexico's Constitution.

7. Declaring that Chapter 27 as amended and WCAIIA, individually and jointly, violate the inalienable right to protect property guaranteed in New Mexico's Constitution.

8. Declaring that Chapter 27 as amended and WCAIIA, individually and jointly, violate the inalienable right to defend life guaranteed in New Mexico's Constitution.

9. Declaring that Chapter 27 as amended and WCAIIA, individually and jointly, damage the health, safety, general welfare, and environment in violation of Article XX, section 21 of New Mexico's Constitution.

10. Declaring that Chapter 27 as amended and WCAIIA, individually and collectively, abdicate the responsibility of government under Article XX, section 21 of the New Mexico Constitution to control pollution.

11. Declaring that Chapter 27 as amended and WCAIIA, individually and collectively, damage health, safety and the general welfare in violation of NMSA 1978, section 3-21-1(A) and 3-21-5(A)(3), as well as sections 14-1.3 and 14-4.1(A)(2) of the Santa Fe City Code.

12. Declaring that Ordinances 2016-42 and 2017-18 unlawfully adopted zoning changes without notice to neighbors.

13. Declaring that Chapter 27 as amended violates the human and civil rights of the residents of Santa Fe in violation of the Santa Fe City Charter.

14. Declaring that Chapter 27 as amended damages the City's environment in violation of the Santa Fe City Charter.

15. Declaring that Chapter 27 provides for the creation of public nuisances in violation of City and State law.

16. Declaring that the Mayor's Proclamations, and the contract with Verizon Wireless entered into thereunder are null and void.

17. Declaring that "environment" does not mean "health" in Section 704 of the Telecommunications Act of 1996.

18. Declaring that Section 704 violates Due Process and Free Speech guaranteed by the United States Constitution.

19. Declaring that Chapter 27 as amended, WCAIIA, and Section 704, individually and collectively, violate the Right to Petition guaranteed by the First Amendment of the United States Constitution.

20. Preliminarily and permanently enjoining the City, its officers, agents, servants, employees, and attorneys and those persons in active concert or participation with it who receive actual notice of the Order by personal service or otherwise, from enforcing Chapter 27 SFCC 1987 as amended by Ordinances 2016-42 and 2017-18; prohibiting the granting of any additional franchises pending the

outcome of this lawsuit; and prohibiting the operation of any cell towers or antennas erected under existing franchises pending the outcome of this lawsuit.

21.     Enjoining the operation of any and all cell towers erected pursuant to the Mayor's Proclamations and the contract with Verizon Wireless entered into thereunder pending the outcome of this lawsuit.

22.     Preliminarily and permanently enjoining Attorney General Balderas from enforcing WCAIIA pending the outcome of this lawsuit.

23.     Preliminarily and permanently enjoining the United States, its officers, agents, servants, employees, and attorneys and those persons in active concert or participation with it who receive actual notice of the Order by personal service or otherwise, from enforcing 47 U.S.C. §§ 332(c)(7)(B)(iv) and (v) pending the outcome of this lawsuit.

24.     Preliminarily and permanently enjoining the United States, its officers, agents, servants, employees, and attorneys and those persons in active concert or participation with it who receive actual notice of the Order by personal service or otherwise, from adopting or enforcing any law that prohibits States or local governments, with respect to wireless telecommunications facilities, from enforcing land use regulations in the public rights-of-way that would otherwise apply pending the outcome of this lawsuit.

25.     Awarding costs, and reasonable attorneys' fees as provided under law.

26.     Awarding such other relief as this Court considers just and proper.

Respectfully submitted,

/s/ Kathleen M. Prlich

Kathleen M. Prlich, Esq.
Attorney for Monika Steinhoff and Santa Fe
    Alliance for Public Health and Safety
1704-B Llano St. #150
Santa Fe, NM 87505
(301) 455-7043

Arthur Firstenberg, pro se
P.O. Box 6216
Santa Fe, NM 87502
(505) 471-0129