**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

SANTA FE ALLIANCE FOR PUBLIC HEALTH
AND SAFETY, ARTHUR FIRSTENBERG, and
MONIKA STEINHOFF,

       Plaintiffs,

vs.                                                           No. 1:18-cv-01209-KG-JHR

CITY OF SANTA FE, NEW MEXICO;
HECTOR BALDERAS, Attorney General of New
Mexico; and the UNITED STATES OF AMERICA,

       Defendants.

---

**OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISMISS
AND MEMORANDUM OF LAW IN SUPPORT**

---

ADAM CHERSON
10 West 66th Street
New York, NY 10023
(917) 922-1140
law@cherson.net
*Attorney for Plaintiffs Monika Steinhoff and
Santa Fe Alliance for Public Health and Safety*

ARTHUR FIRSTENBERG, pro se
P.O. Box 6216
Santa Fe, NM 87502
(505) 471-0129
bearstar@fastmail.fm

July 8, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND OF SECTION 704 ...................................................................... 1

I.      The FCC Has No Authority over Health or Environment ................................................ 1

II.     The FCC's Human Exposure Guidelines Are Neither Mandatory nor Enforceable ......... 2

III.    Actions by the FCC in Enforcing Section 704 ................................................................. 7

IV.     Previous Litigation Challenging Section 704 .................................................................. 8

ARGUMENT ............................................................................................................................. 9

I.      Plaintiffs Have Standing to Sue the United States ........................................................... 9

II.     The United States Has Waived Sovereign Immunity ....................................................... 13

III.    Section 704 Deprives Plaintiffs of Life, Liberty and Property without Due Process
        of Law ............................................................................................................................ 14

IV.     Section 704 Is an Unconstitutional Burden on Speech ................................................... 17

V.      Section 704 Restricts the First Amendment Right to Petition ......................................... 20

CONCLUSION ......................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*360 degrees Commc'ns Co. of Charlottesville v. Bd. of Sup'rs of Albemarle Cty.*,
    211 F.3d 79 (4th Cir. 2000) ............................................................................................ 10, 16

*Adderley v. Florida*,
    385 U.S. 39 (1966)..........................................................................................................20-21

*Albright v. Oliver*,
    510 U.S. 266 (1994)............................................................................................................ 17

*Bakay v. Yarnes*,
    2005 WL 2454168 (W.D.Wash. Oct. 4, 2005) ....................................................................... 24

*BE & K Constr. Co. v. NLRB*,
    536 U.S. 516 (2002)............................................................................................................ 21

*Bill Johnson's Restaurants, Inc. v. NLRB*,
    461 U.S. 731 (1983)...................................................................................................... 21, 23

*Boler v. Earley*,
    865 F.3d 391 (6th Cir. 2017) ............................................................................................... 17

*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011)............................................................................................................ 21

*Cabrera v. Martin*,
    973 F.2d 735 (9th Cir. 1992) ............................................................................................... 13

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)............................................................................................................ 21

*Cellular Phone Taskforce v. FCC*,
    205 F.3d 82 (2nd Cir. 2000).............................................................................................. 8-9

*Cellular Telephone Company v. Town of Oyster Bay*,
    166 F.3d 490 (2nd Cir. 1999).............................................................................................. 19

*City of Chicago v. Morales*,
    527 U.S. 41 (1999).............................................................................................................. 15

*Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993) ........................................................................................................... 23

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) .................................................................................. 11

*Dan's City Used Cars, Inc. v. Pelkey,*
   569 U.S. 251 (2013) .................................................................................. 23

*Duke Power Co. v. Carolina Environmental Study Group, Inc.,*
   *438 U.S. 59, 88 (1978)* ............................................................................22-23

*Farina v. Nokia,*
   625 F.3d 97 (3rd Cir. 2010), *cert. denied*, 565 U.S. 928 (2011) ........................... 21

*FCC v. League of Women Voters,*
   468 U.S. 364 (1984) .................................................................................. 20

*Federal Communications Commission v. WNCN Listeners Guild,*
   450 U.S. 582 (1981)...................................................................................8-9

*Friends of the Earth v. Laidlaw Envtl. Servs.,*
   528 U.S. 167, (2000) ................................................................................. 9

*Goforth v. Smith,*
   991 S.W.2d 579 (Ark. 1999) .................................................................... 5, 21

*Green v. Post*, 574 F.3d 1294,
   (10th Cir. 2009) ....................................................................................... 16

*Guertin v. Michigan,*
   912 F.3d 907 (6th Cir. 2019) ...................................................................... 17

*Initiative & Referendum Inst. v. Walker,*
   450 F.3d 1082 (10th Cir. 2006) ................................................................... 20

*Jaffee v. United States,*
   592 F.2d 712 (3d Cir. 1979), *cert. denied*, 441 U.S. 961 (1979)........................... 13

*Jasso v. Citizens Telecomm. Co. of California, Inc.,*
   2007 WL 2221031 (E.D. Cal. 2007) ......................................................... 5, 21

*Linn v. Plant Guard Workers,*
   383 U.S. 53 (1966).................................................................................... 22

*Marijuana Policy Project v. United States,*
   304 F.3d 82 (D.C. Cir. 2002)...................................................................... 20

*Mays v. Snyder,*
   No. 16-000017-MM (Mich. Ct. Cl. Oct. 26, 2016) ................................................. 17

*Mays v. Snyder,*
   916 N.W.2d 227 (Mich. App. 2018) ...................................................................... 17

*Medtronic, Inc. v. Lohr,*
   518 U.S. 470 (1996) .............................................................................................. 23

*Miami Herald Publishing Co. v. Tornillo,*
   418 U.S. 241 (1974) .............................................................................................. 19

*Missouri v. McNeely,*
   569 U.S. 141 (2013) .............................................................................................. 17

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
   138 S. Ct. 1461 (2018) ......................................................................................... 20

*New York v. United States,*
   505 U.S. 144 (1992) .............................................................................................. 20

*New York Central R.R. Co. v. White,*
   243 U.S. 188 (1917) .............................................................................................. 22

*Patchak v. Jewell,*
   109 F.Supp.3d 152 (D.D.C. 2015) ......................................................................... 24

*Pinney v. Nokia,*
   402 F.3d 430 (4th Cir. 2005), *cert. denied*, 546 U.S. 998 (2005) .......................... 21

*Robbins v. New Cingular Wireless PCS, LLC,*
   854 F.3d 315 (6th Cir. 2017) .......................................................................... 5, 21

*Robbins v. U.S. Bureau of Land Management,*
   438 F.3d 1074 (10th Cir. 2006) ........................................................................... 13

*Roe v. Wade,*
   410 U.S. 113 (1973) .............................................................................................. 14

*Screws v. United States,*
   325 U.S. 91 (1945) ................................................................................................ 14

*Secretary of State of Md. v. Joseph H. Munson Co.,*
   467 U.S. 947 (1984) .............................................................................................. 12

*Seegmiller v. LaVerkin City*,
  528 F.3d 762 (10th Cir. 2008) ........................................................ 9, 16

*Silkwood v. Kerr-McGee Corp.*,
  464 U.S. 238 (1984) ............................................................................. 23

*Simmat v. U.S. Bureau of Prisons*,
  413 F.3d 1225 (10th Cir. 2005) ......................................................... 13

*Stanley v. Amalithone Realty, Inc.*,
  94 A.D.3d 140 (N.Y. App. Div. 2012) .............................................. 5, 21

*Sure–Tan, Inc. v. NLRB*,
  467 U.S. 883 (1984) ............................................................................. 21

*T-Mobile Northeast LLC v. Town of Ramapo*,
  701 F.Supp.2d 446 (S.D.N.Y. 2009) .............................................. 18-19

*Turner Broadcasting System v. FCC*,
  512 U.S. 622 (1994) ............................................................................. 19

*U.S. v. Murdock Mach. & Eng'g. Co. of Utah*,
  81 F.3d 922 (10th Cir. 1996) ............................................................. 13

*Union Pac. Ry. Co. v. Botsford*,
  141 U.S. 250 (1891) ............................................................................. 17

*United Nuclear Corp. v. Allendale Mut. Ins. Co.*,
  103 N.M. 480 (N.M. 1985) .................................................................... 8

*United Workers v. Laburnum Corp.*,
  347 U.S. 656 (1954) ............................................................................. 22

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ........................................................................ 9, 16

*West v. Atkins*,
  487 U.S. 42 (1988) ............................................................................... 11

### Administrative Decisions

*Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*,
  ET Docket No. 93-62,
  11 FCC Rcd. 15123, Report and Order (Aug. 6, 1996) ..................................... 2, 6-7

*Inquiry Concerning Biological Effects of Radio Frequency Radiation When the Use of Radio Frequency Devices is Authorized,*
44 Fed. Reg. 37008, 37011 (June 25, 1979) ........................................................... 2

*In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Development*, WT Docket 17-79

2018 WL 1559856, Second Report and Order (Mar. 30, 2018) ................................ 7

33 F.C.C.R. 9088, Third Report and Order (Sept. 27, 2018) .................................... 8

*In re Use of Spectrum Bands Above 24 GHz For Mobile Radio Services*, GN Docket No. 14-177,
FCC Rcd. 8014, Report and Order (Jul 14, 2016) .................................. 7

*Notice of Proposed Rule Making*, ET Docket No. 93-62,
8 FCC Rcd. 2849 (Apr. 8, 1993) .......................................................... 2

## Constitutional Provisions

U.S. Constitution, Amendment One ................................................... 1, 9, 12, 17-24

U.S. Constitution, Amendment Five .................................................... 9, 14-17, 22

U.S. Constitution, Article III ............................................................... 9

U.S. Constitution, Commerce Clause ...................................................... 20

U.S. Constitution, Supremacy Clause .................................................... 20

## Statutes

Administrative Procedure Act,
5 U.S.C. § 702 ............................................................................ 13

Communications Act of 1934 ............................................................... 1

Federal Aviation Administration Authorization Act of 1994 ...................... 23

Medical Device Amendments of 1976 ..................................................... 23

National Environmental Policy Act, Pub. L. 91-190, 83 Stat. 852 .............. 2, 4, 6, 7, 13

National Historic Preservation Act ......................................................... 7

National Labor Relations Act ............................................................... 23

Reorganization Plan No. 3 of 1970, 84 Stat. 2086 .......................................................... 3

Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56 ......................................... 3, 4, 6

   Section 704 ............................................................................................ *passim*

Wireless Consumer Advanced Infrastructure Investment Act, NMSA 1978 § 63-9I (2018) ....... 11

28 U.S.C. § 1331 ..................................................................................................... 13

47 U.S.C. § 332(c)(7)(B)(i) ....................................................................................... 12

47 U.S.C. § 332(c)(7)(B)(ii) ...................................................................................... 12

47 U.S.C. § 332(c)(7)(B)(iii) ..................................................................................... 12

47 U.S.C. § 332(c)(7)(B)(iv) ........................................................................ 4, 12, 14, 18

47 U.S.C. § 332(c)(7)(B)(v) ......................................................................... 5, 12, 14, 18

## Ordinances

Santa Fe City Code, Chapter 27 .................................................................................. 11

## Regulations

47 C.F.R. § 1.1307 ...................................................................................................... 6

   Table 1, "Transmitters, Facilities and Operations Subject to Routine Environmental
   Evaluation ............................................................................................................ 6

47 C.F.R § 1.1307(b)(1) .............................................................................................. 6

47 C.F.R § 1.1307(c) .................................................................................................. 22

47 C.F.R § 1.1307(e) ................................................................................................... 7

47 C.F.R § 1.1313(a) .................................................................................................. 22

47 C.F.R. § 30.202(a) ................................................................................................... 7

## Other Authority

"Development of RF Radiation Exposure Guidelines," Briefing for the Federal
   Communications Commission, Office of Radiation and Indoor Air, U.S. Environmental
   Protection Agency, March 22, 1995 ............................................................................. 3

*Federal Register*, Vol. 33, No. 247, p. 19052 ................................................................................. 3

House of Representatives Report No. 104-204 (July 24, 2995) .................................................... 4

House of Representatives Report No. 104-458 (Jan. 31, 1996) ................................................... 11

Senate Report No. 104-140 (Sept. 13, 1995) ............................................................................. 4

## INTRODUCTION

Plaintiffs' First Amended Complaint (Doc. 19) ("FAC") alleges facts that are more than sufficient to allow the Court to conclude that the actions and policies of Defendant United States ("Defendant") in adopting and enforcing Section 704 of the Telecommunications Act of 1996 ("Section 704") have deprived Plaintiffs of their most basic constitutional rights, including their right to free speech, their right to their property, their right to move about freely, their right to bodily integrity, and their right to a future on this Earth in this country. Plaintiffs have standing to bring these claims, and Defendant does not possess sovereign immunity from these claims.

## FACTUAL BACKGROUND OF SECTION 704

Defendant's dual contentions about the Federal Communications Commission ("FCC") —that the agency has no role in enforcing Section 704 (Motion to Dismiss ("Mot.") at 5), and that Plaintiffs' only recourse for injuries is to petition the FCC for relief (Mot. at 21)—are mutually contradictory. The fact that the FCC is the agency charged with enforcing Section 704's mandates concerning (ostensibly) health despite the FCC having neither expertise nor authority over matters of health is part of the regulatory scheme that has given rise to Plaintiffs' constitutional challenges to that law. Section 704 is the cause both of Plaintiffs' injuries and of the lack of any possibility of a remedy for those injuries.

## I.      The FCC Has No Authority over Health or Environment

The FCC's authorizing statute—the Communications Act of 1934—gives the FCC no authority over health or the environment. It contains the word "environmental" nowhere else than in Section 704. It contains the word "environment" nowhere. It does not use the word "health" in connection with radio frequency ("RF") radiation. Accordingly the FCC has

repeatedly and consistently denied any expertise or authority over health and safety, *see Inquiry Concerning Biological Effects of Radio Frequency Radiation When the Use of Radio Frequency Devices is Authorized*, FCC 79-364, ¶ 20, 44 Fed. Reg. 37008, 37011 (June 25, 1979) ("The Commission's position is that it has neither the responsibility nor the authority to establish health and safety radiation standards"); *see also Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, ET Docket No. 93-62, Report and Order, ¶ 28, 11 FCC Rcd. 15123, (Aug. 6, 1996) ("The Commission has stressed repeatedly that is not a health and safety agency").

## II.    The FCC's Human Exposure Guidelines Are Neither Mandatory nor Enforceable

In 1993, the FCC issued a *Notice of Proposed Rule Making*[1] in which it proposed to update its guidelines for human exposure to RF radiation. The guidelines were not mandatory—the FCC did not have the authority to adopt mandatory standards—and did not ensure safety. They were not exposure limits that the FCC's licensees could not exceed. Rather, they were procedural guidelines that functioned only as cutoff values for the filing of Environmental Assessments ("EAs"), in compliance with the requirements of the National Environmental Policy Act ("NEPA").[2] Since it had no expertise in health, the FCC proposed to adopt existing guidelines that had been developed by the committees of private organizations which were composed largely of representatives of the telecommunications industry: the American National Standards Institute, the National Council on Radiation Protection and Measurements, and the International Radiation Protection Association.[3] The FCC's guidelines protected only against thermal effects, i.e. exposure levels that cause gross heating of the human body. FAC ¶¶ 18, 19.

---

[1] *Notice of Proposed Rule Making*, 8 FCC Rcd. 2849 (Apr. 8, 1993).
[2] 42 U.S.C. § 4321 *et seq.*, Pub. L. 91-190, 83 Stat. 852.
[3] 8 FCC Rcd. at 2852-53.

Two years went by, and the FCC did not adopt new guidelines. In 1995 the Environmental Protection Agency ("EPA"), which had both the authority and the mandate to develop regulations for human exposure to non-ionizing (which includes RF) radiation,[4] stepped in. EPA issued an announcement on March 22, 1995 that it had completed Phase I of its regulatory program, that it was beginning to circulate its draft RF exposure standards to other agencies for their comment, and that it expected the standards to be finalized in early 1996. Phase 1, stated EPA, was going to protect only against thermal effects, i.e. heating of the human body by RF radiation. EPA stated explicitly that its Phase 1 regulations did *not* protect against "modulation, chronic exposure, [or] nonthermal effects."[5] It stated that after the adoption of the Phase 1 standards, it was going to take two years to develop Phase 2 of its regulations, which would protect against nonthermal exposures and modulation effects.[6] Since all cell phones transmit information in the form of RF radiation modulated[7] at low frequencies (FAC ¶ 35), and since EPA had previously stated "it is not possible to assign a low intensity limit below which the exposures [to modulated RF radiation] are without effect" (FAC ¶ 17), cell phones were potentially going to be illegal.

At that time the Congressional bill that would became the Telecommunications Act of 1996 did not contain Section 704. The telecommunications industry was planning to begin selling digital cell phones to the public the following year and to begin building a dense network

---

[4] Reorganization Plan No. 3 of 1970, 84 Stat. 2086, § 2(a)(3)(ii)(C) gave the EPA responsibility for "development of criteria and standards" for certain functions of the Bureau of Radiological Health ("BRH"). This included the functions of BRH's Division of Environmental Radiation, which had authority over "ionizing and nonionizing radiation." 33 *Fed. Reg.* 19052.

[5] "Development of RF Radiation Exposure Guidelines," Briefing for the Federal Communications Commission, Office of Radiation and Indoor Air, U.S. Environmental Protection Agency, March 21, 1995, https://ecfsapi.fcc.gov/file/1426270001.pdf, p. 4.

[6] *Id.*, p. 5.

[7] In telecommunications, modulation is the process of varying one or more of the properties of a high frequency carrier signal so that it carries a lower frequency informational signal.

of cell towers throughout the United States so that the phones would work. To facilitate this, Congress wrote EPA out of the picture and awarded preemptive authority over "the environmental effects of radio frequency emissions"—which has been universally interpreted to mean "health effects"—to an agency with no expertise in environment *or* health: the FCC. Section 704 was added to the bill by the House Committee on Commerce on July 24, 1995.[8] On September 13, 1995, the Senate Committee on Appropriations deleted all funding for EPA's regulatory effort from the 1996 budget and wrote that "the Committee believes EPA should not engage in EMF activities."[9] And on February 8, 1996, President Clinton signed into law the Telecommunications Act,[10] of which Section 704 awarded preemptive authority over the environment and ostensibly health to an agency with no expertise or authority in either area.

Today the FCC *still* has no authority over health or environment, and Section 704 did not confer any. Section 704 simply commanded the FCC that within 180 days it was to "complete action" in ET Docket 93-62,[11] which was the rulemaking that it had begun in 1993 in order to update its procedural guidelines. Those guidelines were authorized under NEPA, *not* the Communications Act. But, perversely, Section 704 also prohibited States and local governments from regulating wireless facilities on the basis of their environmental effects, "to the extent" that such facilities complied with the FCC's guidelines[12] which, however, were non-mandatory and unenforceable. It was all smoke and mirrors. Henceforth States and local governments were no longer permitted to set limits on radiation that were more stringent than the FCC's limits which,

---

[8] House of Representatives Report No. 104-204.
[9] Senate Report No. 104-140. "EMF" stands for "electromagnetic fields" and includes RF radiation.
[10] Pub. L. 104-104.
[11] *Id.,* § 704(b). Section 704(b) was not incorporated into the Communications Act.
[12] 47 U.S.C. § 332(c)(7)(B)(iv).

however, were not enforceable. The result was a regulatory free-for-all and the public was left without any protection at all.

The disadvantage to the public is extreme. If a city nevertheless dares to protect its citizens and denies a telecommunications company a permit for a cell tower in order to protect the public health, the company is empowered by Section 704 to file suit "in any court of competent jurisdiction," which is required to "decide such action on an expedited basis," or in the alternative the company may "petition the FCC for relief."[13] However, if anyone in the public is actually injured by a cell tower, that person may *not* petition the FCC for relief *nor file suit in any court whatsoever*. Section 704 not only does not authorize such lawsuits, it has been universally interpreted to preempt such lawsuits. *See Stanley v. Amalithone Realty, Inc.*, 94 A.D.3d 140, 146 (N.Y. App. Div. 2012) ("Entertaining plaintiffs' claims [for damages to health and property by RF radiation from a cell tower] would require us to second guess the FCC's standards and engage in our own form of judicial regulation of RF emissions"); *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 320 (6th Cir. 2017) ("Allowing RF-emissions-based tort suits would … shift the power to regulate RF emissions away from the FCC and into the hands of courts and state governments"); *Jasso v. Citizens Telecom. Co. of California, Inc.*, 2007 WL 2221031 (E.D. Cal. 2007) (State tort claims by former Forest Service employees alleging injuries from RF radiation including cancer and brain damage could not be brought against operator of telecommunications facilities); *Goforth v. Smith*, 991 S.W.2d 579 (Ark. 1999) (State tort claim could not be brought against operator of telecommunications facility). Yet the FCC's rules contain no procedure that allows an injured person to file a complaint with the FCC either.

---

[13] 47 USC § 337(c)(7)(B)(v).

There is not even a rule allowing anyone to petition the FCC to revoke a facility's license for exceeding the exposure limits, let alone for causing injury or death.

On August 6, 1996, as commanded by Congress, the FCC issued its Report and Order in ET Docket 93-62, adopting new RF exposure guidelines. [14] The FCC reiterated that the guidelines are procedural only and unenforceable:

> As was true for the previous rules, there are no specific compliance requirements, as such. Under the Commission's NEPA rules, applicants and licensees are required to submit an Environmental Assessment (EA) if they do not comply with our RF exposure guidelines...
>
> The applicant must indicate on its application that it meets the NEPA requirements, and therefore, does not exceed the RF radiation limits. This is usually done by checking a box on a form, which can be done by a clerical person.

Report and Order, pp. 78-79. Even this minimal paperwork is not required if a facility is categorically excluded:

> [A] determination of compliance with the exposure limits in § 1.1310 or § 2.1093 of this chapter (routine environmental evaluation), and preparation of an EA if the limits are exceeded, is necessary only for facilities, operations and transmitters that fall into the categories listed in table 1, or those specified in paragraph (b)(2) of this section. All other facilities, operations and transmitters are categorically excluded from making such studies or preparing an EA, except as indicated in paragraphs (c) and (d) of this section.

47 CFR § 1.1307(b)(1). For cell towers, the FCC categorically excluded all antennas that emit less than 1000 watts of Effective Radiated Power and all towers that are more than 10 meters tall. 47 C.F.R. § 1.1307, Table 1, "Transmitters, Facilities and Operations Subject to Routine Environmental Evaluation." In practice, almost all facilities are excluded from compliance, because few rooftop antennas emit more than 1000 watts, and most towers are more than 10 meters tall.

---

[14] 47 C.F.R. § 1.1307, "Actions that may have a significant environmental effect, for which Environmental Assessments (EAs) must be prepared."

### III.     Actions by the FCC in Enforcing Section 704

Although the FCC has no authority to enforce its exposure standards, it does enforce the

preemption provisions of Section 704. The FCC, as commanded by Congress, incorporated the

provisions of Section 704 into its own rules:

> The Telecommunications Act also provides for resolution of conflicts related to
> the regulation of RF emissions by the courts or by petition to the Commission.
> Accordingly, we are amending § 1.1307 of our rules to incorporate the provisions
> of Section 704 of the Telecommunications Act.

Report and Order, ¶ 166; 47 C.F.R. § 1.1307(e).

In recent actions taken pursuant to its authority to enforce Section 704, the FCC has

removed what little zoning authority States and local governments had left over wireless

telecommunications facilities and stopped pretending that its putative human exposure guidelines

are protective of the public health, let alone have any legal force. In *In re Use of Spectrum Bands*

*Above 24 GHz For Mobile Radio Services*, GN Docket  No. 14-177, Report and Order, ¶ 277,

FCC Rcd. 8014 (Jul 14, 2016), the FCC set power limits for millimeter waves (the frequencies

that will be used for 5G) so high[15] that they do not even protect the public against shocks and

burns. FAC ¶ 20. Then, instead of requiring telecommunications companies to certify that

millions of small cells were going to exceed the FCC's exposure guidelines, the FCC declared

that "small" wireless facilities in the public rights-of-way are not subject to NEPA. *In re*

*Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure*

*Development*, WT Docket 17-79, Second Report and Order, ¶ 71, 2018 WL 1559856 (Mar. 30,

2018) ("[T]his decision removes small cells from the purview of the National Historic Preservation

Act and National Environmental Policy Act"). Then, the FCC imposed a 60-day (for antennas on

---

[15] 75 dBm (30,000 watts) per 100 MHz of spectrum; codified in 47 C.F.R. § 30.202(a).

existing utility poles) or 90-day (for antennas on new structures) "shot clock" within which local governments must approve any application for multiple antennas in the public rights-of-way, no matter how numerous the antennas: if an application is for 10,000 antennas on existing lampposts on the streets and sidewalks of a city, that city has 60 days in which to approve all 10,000 antennas. *Id.*, Third Report and Order, 33 F.C.C.R. 9088, *59 (Sept. 27, 2018) ("If a single application seeks authorization for multiple deployments… then the presumptively reasonable period of time for the application as a whole is equal to that for a single deployment…"). All this is the result of an unconstitutional law, Section 704, adopted in 1996, which deprives citizens of any right to protect themselves from injury, *prohibits* their local governments from protecting them, denies the injured access to the courts, and denies the injured any remedy for their injuries. No one has been minding the store since 1996, and now the charade has been unmasked for all to see.

**IV.     Previous Litigation Challenging Section 704**

In 1997, a coalition of more than 50 citizens groups and individuals and the Communications Workers of America petitioned the Second Circuit Court of Appeals for review of the FCC's final rule in ET Docket 93-62. *Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2000). The Second Circuit ruled that the FCC did not abuse its discretion and upheld the agency's exposure guidelines. However, with respect to the present action which is the subject of Defendant's Motion to Dismiss, it is important to note what the Second Circuit did not do:

- The court did not rule on whether RF radiation harmed Petitioners. *Cellular Phone Taskforce* was an appeal brought under the APA, not a civil complaint for violation of fundamental rights. The evidentiary standards are different. In a rulemaking challenge, the FCC need only provide a "rational explanation" for a court to uphold its rule. *Federal Communications*

*Commission v. WNCN Listeners Guild*, 450 U.S. 582, 595 (1981). Under constitutional review, for violation of fundamental rights, the standard is "strict scrutiny." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 771 (10th Cir. 2008) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

- The court did not analyze, and was not asked to analyze, whether "environmental" means "health" in Section 704.

- The court did not address due process, free speech, the right to petition, or the Takings Clause.

 Plaintiffs here are bringing these claims before a court for the first time. Plaintiffs are among the millions of Americans who have been injured, driven from their homes, businesses and cities, and killed by radiation from a steadily increasing density of cell towers and antennas while being deprived of any remedy whatsoever, not because of the actions of their cities and States in failing to protect them, but because Section 704 of the Telecommunications Act *prohibits* their cities and States from protecting them, and deprives them even of the right to go to court to seek a remedy for their injuries.

**ARGUMENT**

## I.      Plaintiffs Have Standing to Sue the United States

To satisfy Article III's standing requirements, Plaintiffs must show: (1) they have suffered an "injury in fact" that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000).

Defendant admits, as it must, that Plaintiffs' First Amended Complaint satisfies the first

prong of the standing requirement: Plaintiffs have shown injury in fact, and that further injury is imminent. Defendant's contentions as to traceability and redressability amount to the same fallacious argument, i.e. that Plaintiffs' injuries are traceable only to actions of the States, and are redressable only by the States, not by the United States.

Defendant's assertion that Plaintiffs' quarrel lies "with the State Defendants' independent land-use decisions" and can "only be redressed by an injunction against the State Defendants" is nonsensical. (Mot. at 11, 13). The State Defendants are powerless to protect citizens, and courts are without jurisdiction to entertain actions for injunctive relief, per the prohibitions contained in Section 704. The United States cannot preempt States and local governments from regulating wireless facilities, and at the same time say that Plaintiffs' quarrel is with States and local governments. Plaintiffs' injuries have been caused *directly* by the action of the United States in adopting Section 704 and by the FCC in enforcing it. Section 704 was and is intended to accelerate the universal placement of wireless telecommunications facilities throughout the United States, including in front of Plaintiffs' homes and businesses, and Section 704 *prohibits* States and local governments from interfering with this policy, including for health or environmental reasons. Indeed, Defendant's brief highlights "the Act's national purpose of facilitating the growth of wireless telecommunications," while "limit[ing] the ability of state and local governments to frustrate" that purpose (quoting *360 degrees Commc'ns Co. of Charlottesville v. Bd. of Sup'rs of Albemarle Cty.*, 211 F.3d 79, 86 (4th Cir. 2000)). (Mot. at 3). Defendant's suggestion that Plaintiffs' injuries can be redressed only "by an injunction against the State Defendants" fails because this Court cannot grant such an injunction unless it also enjoins the enforcement of Section 704—which, however, it cannot do unless the United States is named as a Defendant.

Contrary to Defendant's assertion regarding the interpretation of "environment," a declaration that "environment" in Section 704 does not mean "health"[16] would not only avoid the serious questions as to the constitutionality of Section 704, FAC ¶ 152, but would immediately restore to Plaintiffs their rights to life, liberty and property. Plaintiffs could then testify about health without being penalized, their city government could protect them without the city being sued, and Plaintiffs could go to court when they were injured. It is "settled doctrine that we avoid constitutional questions whenever possible." *West v. Atkins*, 487 U.S. 42, 48 n. 8 (1988).

The joint effect of Section 704, the Wireless Consumer Advanced Infrastructure Investment Act,[17] and the amended chapter 27 of the Santa Fe City Code is not just to "permit" but to mandate the universal placement of commercial facilities, known for half a century to be dangerous to life and limb, FAC ¶ 1, on the streets and sidewalks in Santa Fe where people walk and in front of their children's bedroom windows. The United States' contention that the land use decisions of the City and State are "independent" of the constraints placed on them by Section 704 is similar to the City's contention, in its own motion to dismiss (Doc. 21), that the actions of private telecommunications companies are not constrained by the laws of New Mexico and Santa Fe, and that such laws leave citizens "free" of interference with their constitutional rights. This is like claiming that a person who has been confined in prison for the rest of his life is not deprived of his freedom by the State but rather by the prison's warden. "The actions of the State were part of a causal chain resulting in the undoubted loss of [rights]." *County of Sacramento v. Lewis*, 523 U.S. 833, 856 (1998). The prime mover in the causal chain here is the United States.

---

[16] The *Congressional Record* contains no debate on Section 704 that could indicate the intent of Congress. However, the word "health" does not appear in Section 704, nor in any committee report nor in the Conference Report (H.R. Report 104-458) in connection with Section 704.

#NMSA 1978 § 63-9I (2018).#

Defendant is engaging in sleight of hand when it alleges that Section 704 "preserves the power of local zoning authority" (Mot. at 3). In fact the "five limitations" (Mot. at 3) on local jurisdictions' authority to regulate cell towers leave them no authority at all. The prohibition against discriminating among providers, 47 U.S.C. § 332(c)(7)(B)(i)(I), means that if they approve one cell tower they must approve every cell tower. The requirement to act on applications "within a reasonable period of time," *id.* § 332(c)(7)(B)(ii), has deprived localities of the ability to act on applications at all. The prohibition against consideration of health and environment, *id.* § 332(c)(7)(B)(iv), has had the effect of mandating the erection of injurious facilities in residential zones where people walk and next to their homes. The requirement that decisions denying applications must be "supported by substantial evidence," *id.* § 332(c)(7)(B)(iii), has virtually prohibited local governments from denying any applications at all, especially with the sword of Damocles hanging over them that is contained in Section 332(c)(7)(B)(v), which allows any telecommunications company to sue a state or local government in "any court of competent jurisdiction" for any alleged infraction of sections (i) through (iv) and provides that such lawsuit shall be heard "on an expedited basis."

Plaintiffs note that courts err on the side of finding standing when, as here, First Amendment violations are alleged, *see Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, (1984):

> Within the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing. Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Id.* at 956.

## II.     The United States Has Waived Sovereign Immunity

Plaintiffs bring this action under 28 U.S.C. § 1331 (federal question), and various courts,

including the Tenth Circuit, have ruled that the United States, pursuant to 5 U.S.C. § 702, has

waived sovereign immunity for all claims against it for non-monetary relief, specifically including

claims brought under 28 U.S.C. § 1331. *See U.S. v. Murdock Mach. & Eng'g Co. of Utah*, 81

F.3d 922, 929 n. 8 (10th Cir. 1996) ("Effective October 21, 1976, Congress amended Section(s)

10(b) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, to provide a general waiver

of the government's sovereign immunity from injunctive relief"); *Robbins v. U.S. Bureau of*

*Land Management*, 438 F.3d 1074, 1080 (10th Cir. 2006) ("We have recognized that [the language

in Section 702] 'waive[s] sovereign immunity in most suits for nonmonetary relief' against the

United States, its agencies, and its officers" (quoting *Simmat v. U.S. Bureau of Prisons*, 413 F.3d

1225, 1233 (10th Cir. 2005)); *Jaffee v. United States*, 592 F.2d 712, 718 (3d Cir. 1979), *cert.*

*denied*, 441 U.S. 961 (1979) ("Congress amended section 702 with a specific purpose of waiving

sovereign immunity in equitable actions brought under section 1331"); *Cabrera v. Martin*, 973

F.2d 735, 741 (9th Cir. 1992) ("Contrary to the assertions of the federal defendants, this Court

has repeatedly found that § 702 waives the sovereign immunity of the United States with respect

to *any* action for injunctive relief under 28 U.S.C. § 1331" (emphasis in original)).

Defendant nevertheless asserts, contrary to Tenth Circuit precedents, that the waiver of

immunity does not apply, and that the United States may not be named as a defendant, unless the

claim involves *agency* action or inaction. Even if this Court agrees that agency action is required,

Defendant's assertion that "the FCC is not charged with enforcing Section 704," and that

13

therefore no "agency" has done anything involving Plaintiffs, is incorrect. As noted under Factual Background of Section 704, *supra*, Section 704 charges the FCC with enforcing 47 U.S.C. § 332(c)(7)(B)(iv), including adjudicating complaints by telecommunications companies alleging its violation; the FCC has adopted verbatim the language of Section 704 into its rules; and the FCC has recently issued rules, enforcing 47 U.S.C. § 332(c)(7)(B)(iv), which have greatly relaxed the power limits for millimeter wave emissions while exempting small cells in the public rights-of-way from the requirements of NEPA. Plaintiffs' injuries are caused both directly by Section 704 and by its enforcement by the courts and the FCC as authorized under 47 U.S.C. § 332(c)(7)(B)(v). To eliminate any question about sovereign immunity or the absence of a necessary party, Plaintiffs request that the Court grant Plaintiffs leave to amend their complaint to add the Federal Communications Commission as a party defendant.

## III.   Section 704 Deprives Plaintiffs of Life, Liberty and Property without Due Process of Law

By asserting that Plaintiffs are not being deprived of the rights to "marriage or procreation," the United States is attempting to make the Court forget that Plaintiffs are being deprived of rights that are much more serious: the right to travel, the right to bodily integrity, the right to live in their own homes, the right to life itself. Plaintiffs' substantive due process claim is anything but "cursory." It is the very heart of their Complaint. It is their first cause of action against the City and the New Mexico Attorney General. FAC ¶¶ 59-66. And it is their first cause of action against the United States about the constitutionality of Section 704. FAC ¶¶ 154-158.

The "right to life itself" is the most fundamental of all rights; it is "the right which comprehends all others," *Screws v. United States*, 325 U.S. 91, 133 (1945), and is "entitled to Fourteenth Amendment protection." *Roe v. Wade*, 410 U.S. 113, 159 (1973). There can be no

"rational basis" (Mot. at 22) for governments to be able to cause someone injury or death for simply living in their home. Plaintiff Firstenberg fled his apartment in Brooklyn within one week of a cell tower being erected nearby to save his life. FAC ¶ 25. Cell tower radiation has caused him laryngospasm, heart arrhythmias, and elevated cardiac enzymes, indicating damage to cardiac and/or skeletal muscle, all of which are life-threatening. FAC ¶ 25.

Many members of Plaintiff Alliance are environmental refugees, having fled homes after a cell tower was erected nearby. FAC ¶ 24. One member began having seizures when a cell tower was erected near her home. Another, a former city planner, hears the radiation, developed neurological, cardiac and respiratory problems when a tower was erected near her home, and developed an unusual form of lung cancer. Another, a psychotherapist and artist, was forced to flee her home for the same reason and became homeless. Another, a psychologist and author, became homeless for the same reason. Another, a world-class athlete, was homeless for eight years for the same reason. Another, a physicist at Los Alamos National Laboratory, had to leave his job for the same reason and almost became homeless. Radiation from cell towers has cost these people their property, their liberty, their livelihood, and nearly their lives. FAC ¶ 24.

The acute effects of RF radiation—among them headaches, dizziness, nausea, eye pain, insomnia, tachycardia, hypertension, irregular heartbeat, anxiety, depression, memory loss, nosebleeds, digestive problems, and ringing in the ears—have driven an estimated 20 million people from their homes worldwide and have created a large class of environmental refugees. FAC ¶ 36. "[A]n individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers." *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999). The rights of Plaintiffs not only to remain in public places, but to remain in their

own home or their own city has been denied them. FAC ¶¶ 23-27, 62, 74, 122.

This set of facts involving prior, ongoing, and imminent physical and constitutional injuries are all incorporated by reference into the Eighteenth Cause of Action for violation of substantive due process. FAC ¶ 154.

Defendant admits that all this is the result of deliberate federal policy, and that Section 704 was enacted to "'encourage the rapid deployment of new telecommunications technologies" and to "limit the ability of state and local governments to frustrate [this] purpose.'" Mot. at 3 (quoting *360 degrees Commc'ns*, 211 F.3d at 86). It is precisely Section 704 that has cost so many people, including Plaintiffs, their liberty, property and lives. Moreover, Defendant has known for at least fifty years that the expansion of wireless technology would endanger Plaintiffs and their environment. FAC ¶ 1, 16-19. Deliberate indifference to plaintiffs' rights establishes a substantive due process claim in cases where a state actor has sufficient time to deliberate. *Green v. Post*, 574 F.3d 1294, 1301 (10th Cir. 2009). The purpose behind the policy does not absolve Defendant of liability. "The Due Process Clause 'guarantees more than fair process.' … In its substantive mode, [it] provides protection against arbitrary and oppressive government action, even when taken to further a legitimate governmental objective." *Seegmiller v. LaVerkin City*, 528 F.3d at 766-67 (quoting *Washington v. Glucksberg*, 521 U.S. at 719).

Contrary to the assertion of Defendant (Mot. at 22), the fundamental right to bodily integrity is also implicated. There is no question, and no debate within the scientific community, that radio waves emitted from cell towers go through walls, into houses and into human bodies. FAC ¶ 36. There is overwhelming medical and scientific evidence, alleged with particularity in the complaint and amounting to over 10,000 peer-reviewed studies, that after entering human

bodies these waves cause acute and chronic injury and create disease.  FAC ¶¶ 11-20, 24-27, 36. Clearly, this is an invasion of bodily integrity. If the United States wishes to dispute that or other facts about electromagnetic radiation, a trial and not a motion to dismiss is the means to do so.

In a quartet of cases that bear similarities to the present case, citizens of Flint, Michigan, poisoned by lead in their water, alleged a state-created danger in violation of substantive due process. They alleged the state had violated their fundamental interest in bodily integrity. The Michigan Court of Appeals, Michigan Court of Claims, and Sixth Circuit all agreed that the right to bodily integrity is a protected liberty interest and that the plaintiffs had pleaded a plausible Substantive Due Process violation. *Mays v. Snyder,* 916 N.W.2d 227 (Mich.App. 2018); *Mays v. Snyder,* No. 16-000017-MM (Mich. Ct. Cl. Oct. 26, 2016); *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019). In another case, the Sixth Circuit reversed the district court's dismissal for lack of subject matter jurisdiction and remanded for full consideration of the merits of the plaintiffs' constitutional claims. *Boler v. Earley*, 865 F.3d 391, 414 (2017).

The constitutional right to bodily integrity is long-established. *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891); *Albright v. Oliver*, 510 U.S. 266, 272 (1994); *Missouri v. McNeely*, 569 U.S. 141, 159 (2013). Plaintiffs contend that this includes the freedom to live or work in a particular home or place and carry on the activities of life without one's health being harmed and one's life being threatened, not only by lead in city water but by electromagnetic radiation from city-authorized cell towers placed in close proximity to homes and businesses.

## IV.    Section 704 Is an Unconstitutional Burden on Speech

The United States mischaracterizes what Section 704 does. It does not just prohibit local governments from considering speech about health, it also penalizes such speech. It reads:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities *on the basis of* the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(B)(iv) (emphasis added). The next section reads:

> Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof *that is inconsistent with this subparagraph* may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. *The court shall hear and decide such action on an expedited basis.* Any person adversely affected by an act or failure to act by a State or local government that is inconsistent with clause (iv) may petition the Commission for relief.

47 U.S.C. § 332(c)(7)(B)(v) (emphasis added). Based on this language, if local officials or citizens express their concerns about environmental or health effects at a zoning board hearing, and the board denies the request to construct a telecommunications facility, the telecommunications provider may appeal to a local court, which will be forced to hear the case on an expedited basis, or to the FCC. The court or the FCC may overturn the denial and grant the siting request if a transcript of the hearing reveals that opinions were expressed about the health or environmental effects of RF radiation. This exact scenario has been played out all over the country, including here in Santa Fe (FAC ¶ 44), since Section 704 was adopted in 1996. If the public voices their reasons for opposing a permit for a cell tower, and the permit is denied, Section 704 empowers the company whose permit is denied to get that decision overturned. If the public simply opposes the tower but does not give voice to their reasons, the decision will more likely *not* be overturned.

*See T-Mobile Northeast LLC v. Town of Ramapo*, 701 F.Supp.2d 446, 460 (S.D.N.Y. 2009):

> [H]ealth concerns played a prominent role in community opposition to the application. In Planning Board hearings on July 11, September 12, and October 17, 2006, town residents repeatedly spoke of their concern that T–Mobile's proposed facility would create a health hazard. (See R. at 00231, 00256, 00315.)

18

> The Court has no trouble concluding that the Town's decision was at least partly based on the environmental effects of the proposed tower's radio frequency emissions… T–Mobile is entitled to summary judgment on this claim.

*See also Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2nd Cir. 1999):

> A review of the record before us of the two hearings reveals that the bulk of the testimony addressed citizens' fears of adverse health effects from the cell sites… [W]hen the testimony is almost exclusively directed to health effects, there must be substantial evidence of some legitimate reason for rejecting the applications to avoid the conclusion that the denials were based on the impermissible health effects ground.

Under Section 704, it is in the concerned citizen's or board member's best interest not to express their true opinions because their speech about the health effects of telecommunications facilities is punished by the approval of those very telecommunications facilities.

The Supreme Court held a Florida "right to reply" statute unconstitutional for similar reasons:

> Faced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy.

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257 (1974). Similarly here: faced with the penalties (i.e. approval of a cell tower that they oppose) that would result from speech about health in a public hearing, the public might well conclude that the safe course is to keep silent.

*See also Turner Broadcasting System v. FCC*, 512 U.S. 622, 641-42 (1994):

> The First Amendment, subject only to narrow and well understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals… *Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content.*

(emphasis added).

Defendant's reliance on the Supremacy Clause is misplaced. The Supremacy Clause does

19

not confer any powers on Congress. "Preemption is based on the Supremacy Clause, and that Clause is not an independent grant of legislative power to Congress... [I]n order for [a federal law] to preempt state law, it must satisfy two requirements. First, it must represent the exercise of a power conferred on Congress by the Constitution." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479 (2018). It is the Commerce Clause which confers on Congress the authority to regulate telecommunications. *FCC v. League of Women Voters*, 468 U.S. 364, 376 (1984). But that authority is constrained by the First Amendment.

> "Congress exercises its conferred powers subject to the limitations contained in the Constitution. Thus, for example, under the Commerce Clause, Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment."

*New York v. United States*, 505 U.S. 144, 156 (1992).

In *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1100 (10th Cir. 2006), cited by Defendant, the Court found "no authority for the suggestion that 'limits on legislative authority—*as opposed to limits on legislative advocacy*—violate the First Amendment" (quoting *Marijuana Policy Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002) (emphasis added). It is precisely the limits on regulatory advocacy contained in Section 704—akin to the "legislative advocacy" referred to in *Marijuana Policy*—that violate the First Amendment. Section 704 ensures that if the public dares to advocate for their own protection they will be penalized for it.

## V.   Section 704 Restricts the First Amendment Right to Petition

Contrary to Defendant's assertion, the right to petition is much broader than the right to speech. "The right to petition for the redress of grievances has an ancient history and is not limited to writing a letter or sending a telegram to a congressman; it is not confined to appearing before the local city council, or writing letters to the President or Governor or Mayor." *Adderley*

*v. Florida*, 385 U.S. 39, 49-50 (1966). Plaintiffs' right-to-petition claim encompasses much more than speech. Plaintiffs allege: "Section 704 deprives people of the right to testify about such injury, and deprives their local governments of the power to protect them from the injurious effects of RF radiation. Section 704 deprives people injured, sickened, and/or killed by such radiation of access to state courts for redress for their injuries, and provides them no substitute federal remedy." FAC ¶ 78. *See* cases cited in Factual Background section, *supra*: *Stanley v. Amalithone*; *Robbins v. New Cingular*; *Jasso v. Citizens Telecom.*; *Goforth v. Smith*, all of which dismissed state tort claims against the owners or operators of cell towers on the basis of either conflict preemption or express preemption. *See also Farina v. Nokia*, 625 F.3d 97, 125 (3rd Cir. 2010), *cert. denied*, 565 U.S. 928 (2011) ("Allowing juries to impose liability on cell phone companies for claims like Farina's would conflict with the FCC's regulations"); *Pinney v. Nokia*, 402 F.3d 430, 454-55 (4th Cir. 2005), *cert. denied*, 546 U.S. 998 (2005) (implying that tort claims against operators of cell towers would be expressly preempted).

In particular, the Supreme Court has confirmed that "'the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.'" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-897 (1984) ; *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972)).

Contrary to the assertions of the United States, and as already noted, a rulemaking procedure is not a judicial proceeding and the right to petition the FCC for a rule is not the same as access to the courts. Plaintiffs are not asking for "different radio-frequency regulations" (Mot.

21

at 21), they are asking to be restored their rights to go to court to seek recompense for their injuries. Neither Congress nor the FCC awards damages for injury, no matter how lax or stringent the regulations. An individual may petition the FCC to require an Environmental Assessment to be prepared, 47 C.F.R. § 1.1307(c), or to deny an application for a wireless facility, 47 C.F.R. § 1.1313(a). But no statute or regulation allows anyone to petition to have a facility removed if they are being injured by it.

Plaintiffs' allegation that to prohibit States and local governments from providing any remedy for their injury by RF radiation without providing a substitute federal remedy violates the Fifth Amendment right to Substantive Due Process (FAC ¶ 157) as well as the First Amendment right of access to courts (FAC ¶ 78) has ample support in Supreme Court jurisprudence. In cases spanning more than a century, the Supreme Court has consistently questioned whether such a law would be constitutional, though it has never actually reached the question:

> **[Considering whether a New York law violated due process]** [I]t perhaps may be doubted whether the State could abolish all rights of action on the one hand, or all defenses on the other, without setting up something adequate in their stead.

*New York Central R.R. Co. v. White*, 243 U.S. 188, 201 (1917);

> Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct… We see no substantial reason for reaching such a result.

*United Workers v. Laburnum Corp.*, 347 U.S. 656, 663-64 (1954);

> The fact that the [National Labor Relations] Board has no authority to grant effective relief aggravates the State's concern since the refusal to redress an otherwise actionable wrong creates disrespect for the law….

*Linn v. Plant Guard Workers*, 383 U.S. 53, 64 n. 6 (1966);

> We need not resolve this question here **[whether the Due Process Clause requires a substitute federal remedy]** since the Price-Anderson Act does, in our

view, provide a reasonably just substitute for the common-law or state tort law remedies it replaces.

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 88 (1978);

If the Board is allowed to enjoin the prosecution of a well-grounded state lawsuit, it necessarily follows that any state plaintiff subject to such an injunction will be totally deprived of a remedy for an actual injury… **Considering the First Amendment right of access to courts** … we conclude that the Board's interpretation of the [National Labor Relations] Act is untenable.

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 742-43 (1983) (emphasis added);

It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.

*Silkwood v. Kerr-McGee Corporation*, 464 U.S. 238, 251 (1984);

Medtronic's sweeping interpretation of the [Medical Device Amendments of 1976] would require far greater interference with state legal remedies, producing a serious intrusion into state sovereignty while simultaneously wiping out the possibility of a remedy for the Lohrs' alleged injuries… [W]e cannot accept Medtronic's argument…

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488-89 (1996);

[I]f such state-law claims are preempted [by the Federal Aviation Administration Authorization Act of 1994], no law would govern resolution of a non-contract-based dispute arising from a towing company's disposal of a vehicle previously towed or afford a remedy for wrongful disposal… No such design can be attributed to a rational Congress.

*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). The constitutional questions can be avoided in the present case as well if this Court rules that "environment" does not mean "health." *See* FAC, Requests for Relief ¶ 18. """"When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."""" *Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 629 (1993) (citations omitted).

*Patchak v. Jewell*, 109 F.Supp.3d 152 (D.D.C. 2015), cited by Defendant, is inapposite. The plaintiff in that case disagreed with a decision of the Secretary of the Interior, and a federal law, the Gun Lake Act, prohibited any actions related to that decision from being brought in Federal court. The Gun Lake Act was held not to violate the right of access to courts because he could petition the "Department of the Interior … to reverse its position," which is the same relief he was asking the court for. *Id.* at 164. By contrast, the FCC is *not* empowered to provide any remedy to people injured by cell towers. Only the courts can provide that, and Plaintiffs have been denied access to them, in violation of the First Amendment.

*Bakay v. Yarnes*, 2005 WL 2454168 (W.D.Wash. Oct. 4, 2005), also cited by Defendant, stands for the opposite of the position for which Defendant, quoting out of context, cited it. "[T]he right to petition," ruled the court, "includes the right to petition courts." *Id. at *6*. The court dismissed that case not because there is no constitutional right of access to courts, but because of malicious prosecution and lack of probable cause. "There is simply not a showing here sufficient to justify the conclusion that this statute in some way chills the right of access to the courts." *Id.* The question in that case, said the court, was not about access to the courts but "lack of probable cause and malice." *Id.* at *7.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that the United States' Motion to Dismiss be denied. The United States has waived sovereign immunity. Plaintiffs have standing to bring their claims. Plaintiffs have stated claims upon which relief can be granted. Additionally, Plaintiffs respectfully request leave of this Court to amend their Complaint to add the Federal Communications Commission as a party defendant.

Respectfully submitted,


/s/ *Adam Cherson*
ADAM CHERSON
10 West 66th Street
New York, NY 10023
(917) 922-1140
law@cherson.net
*Attorney for Plaintiffs Monika Steinhoff and*
*Santa Fe Alliance for Public Health and Safety*


ARTHUR FIRSTENBERG, pro se
P.O. Box 6216
Santa Fe, NM 87502
(505) 471-0129
bearstar@fastmail.fm


## CERTIFICATE OF SERVICE

I certify that on this date of July 8, 2019, I served the foregoing Opposition on counsel of record for all parties via the CM/ECF system.


/s/ *Adam Cherson*
ADAM CHERSON